UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  2:14-cr-0043 KJM KJN P |
| Respondent, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| EDWIN FORREST LUDWIG, IV, | |
| Movant. | |

Movant is a federal prisoner proceeding, initially without counsel, but now through appointed counsel, with a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Movant contends that defense counsel Christopher Cosca rendered ineffective assistance during his representation of movant based on counsel's actions and omissions in connection with pending changes to the sentencing guidelines, which prejudiced movant and subjected him to additional prison time.  Following an evidentiary hearing and post-hearing briefing, the undersigned recommends that the motion be denied.

### BACKGROUND

On February 20, 2014, Mr. Ludwig IV was indicted, along with six co-defendants, for conspiracy to defraud the United States with False, Fictitious or Fraudulent Claims, and False Claims Against the United States.  Such violations were alleged to have occurred in or about March 2011, and continuing to in or about August 2012.  (ECF No. 1 at 2.)

1

1    Mr. Ludwig IV was arraigned and detained on April 7, 2014.  (ECF Nos. 55, 57.)  On

2    April 16, 2015, Mr. Cosca and the prosecutor filed a stipulation to advance Mr. Ludwig IV's

3    change of plea hearing from April 29, 2015, to April 22, 2015.  (ECF No. 124.)  On April 20,

4    2015, by minute order, the stipulation was granted, the April 29, 2015 status conference was

5    vacated, and a change of plea hearing was set for April 22, 2015.  (ECF No. 125.)

6    On April 22, 2015, at a change of plea hearing, Mr. Ludwig IV entered a plea of guilty on

7    counts 1, 2, and 8. (ECF No. 127.)  On April 22, 2015, Mr. Ludwig IV signed the plea agreement

8    and it was filed the same day.  (ECF No. 130.)  The plea agreement provided for a base offense

9    level of 20.  (ECF No. 130 at 8.)

10    On May 29, 2015, the sentencing hearing was continued to July 22, 2015, because

11    probation required more time to complete the presentence report ("PSR").  (ECF No. 136.)  On

12    June 25, 2015, by minute order, the July 22, 2015 hearing was vacated and advanced to July 8,

13    2015, based on a joint request by Mr. Cosca and the prosecutor.  (ECF No. 141.)  The stipulation

14    does not reflect the reason the hearing was advanced.  (ECF No. 140.)  The prosecutor filed a

15    sentencing memorandum on July 6, 2015.  (ECF No. 143.)  Mr. Cosca did not file one.

16    On July 8, 2015, Mr. Ludwig IV was sentenced to prison for a term of 84 months on count

17    1, and 60 months on counts 2 and 8, all to be served concurrently for a total term of 84 months to

18    run consecutive to any sentence Mr. Ludwig IV was currently serving.  (ECF No. 145.)  The

19    instant sentence was calculated on the base offense level of 20, with an upward adjustment of 4

20    levels based on Mr. Ludwig IV's role as leader or organizer of the conspiracy, and a reduction of

21    3 based on Mr. Ludwig IV's acceptance of responsibility, for an adjusted offense level of 21.

22    (ECF No. 130 at 8.)  Judgment of conviction was entered on July 10, 2015.  (ECF No. 146.)

23    Mr. Ludwig IV did not file an appeal; he filed his pro se § 2255 motion on July 1, 2016.

24                                    THE INSTANT MOTION

25    I.    LEGAL STANDARD

26    Mr. Ludwig IV seeks to vacate his sentence under 28 U.S.C. § 2255, which provides:

27    A prisoner in custody under sentence of a court established by Act of
      Congress claiming the right to be released upon the ground that the
28    sentence was imposed in violation of the Constitution or laws of the

1
2
3

> United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

4   28 U.S.C. 2255(a).  Thus, "[u]nder 28 U.S.C. § 2255, a federal court may vacate, set aside, or

5   correct a federal prisoner's sentence if the sentence was imposed in violation of the Constitution

6   or laws of the United States."  United States v. Withers, 638 F.3d 1055, 1062 (9th Cir. 2011).

7        "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding

8   under § 2255, whether or not the petitioner could have raised the claim on direct appeal."

9   Massaro v. United States, 538 U.S. 500, 504 (2003).

10  II.      THE PARTES' POSITIONS

11        A.   Initial Briefing

12             1.   The § 2255 Motion

13        In his pro se motion, Mr. Ludwig IV alleged that Mr. Cosca rendered ineffective

14  assistance of counsel in violation of the Sixth Amendment by failing to:  "stay abreast of critical

15  changes to the guidelines even after being prompted by his client;" "properly advise [Mr. Ludwig

16  IV] of the existence of Amendment 791, in fact telling him no such changes existed;"

17  "incorporate said changes in his trial/plea negotiation strategy;" "move to continue [Mr. Ludwig

18  IV's] sentencing date until after the effective date of Amendment 791;" and "preserve for future

19  benefit of appeal [Mr. Ludwig IV's] eligibility under Amendment 791."  (ECF No. 206 at 5.)  Mr.

20  Ludwig IV was the only one of the seven co-conspirators to be sentenced prior to the

21  implementation of Amendment 791, and the only one assessed a base offense level of 20, which

22  arguably prejudiced Mr. Ludwig IV by imposing a prison sentence at least 15 months longer than

23  a post-Amendment 791 sentence would have been.  (Id.)  If Mr. Ludwig IV alleges that had he

24  been properly advised that Amendment 791 was pending, he would not have pleaded guilty, but

25  would have insisted Mr. Cosca employ any accepted legal strategy available to ensure he was

26  sentenced after Amendment 791 became effective.  (ECF No. 206 at 17.)  "The failure to raise a

27  meritorious argument at sentencing . . . qualifies as ineffective assistance under Strickland[,]" . . .

28  [and "[a]ny increase in a defendant's sentence due to ineffective assistance suffices to show

3

1  prejudice."  (ECF No. 206 at 24, quoting Curry v. Palmateer, 62 F. App'x 157, 159 (2003)

2  (unpublished), citing Glover v. United States, 531 U.S. 198, 204 (2001).

3  2.  The Government's Response

4  Respondent first argues that Mr. Cosca's performance was not deficient for failing to

5  incorporate uncertain changes to the Sentencing Guidelines.  Even assuming Mr. Ludwig IV's

6  counsel knew or should have known about Amendment 791 at the time of Mr. Ludwig IV's plea

7  or sentence, Mr. Ludwig IV cannot demonstrate that counsel's failure to delay fell below an

8  objectively reasonable standard of care because:  (a) the proposed amendments were still under

9  review for public comment, months away from adoption by Congress; and (b) counsel had no

10  assurance that such potential changes were certain enough to change Mr. Ludwig IV's sentence.

11  (ECF No. 243 at 6.)  Mr. Ludwig IV's reliance on United States v. Abney, 812 F.3d 1079 (D.C.

12  Cir. 2016), is unavailing because Abney involved a minimal delay, mere days from the virtually

13  certain enactment of the Fair Sentencing Act of 2010 ("FSA"), and would have reduced Abney's

14  mandatory minimum sentence by half, from ten years to five.  (ECF No. 243 at 6.)  Here,

15  Amendment 791 was still under public discussion, so its final form was not yet certain; indeed,

16  Amendment 791 was not adopted until November 1, 2015, four months after Mr. Ludwig IV was

17  sentenced and almost eight months after he pled guilty.  Defense counsel cannot be viewed as

18  ineffective for having failed to use proposed sentencing guidelines changes that were "speculative

19  and far off."  (ECF No. 243 at 7, citing for example, Perez v. Rosario, 459 F.3d 943, 948 (9th Cir.

20  2006) (a petitioner must establish a reasonable probability "that but for counsel's bad advice, the

21  outcome of the plea bargaining would have been different").)  Unlike in Abney, where FSA's

22  mandatory minimum sentence would definitely reduce the sentence, the required reduction in

23  base offense level would not alter the district court's discretion to vary from that range.  (ECF No.

24  243 at 7, citing see United States v. Booker, 543 U.S. 220, 245-46 (2005) (district courts must

25  consider the Sentencing Guidelines but have discretion to vary or depart from such guidelines).)

26  Such uncertainty supports a finding that counsel's decision not to rely on the uncertain change

27  was not ineffective under Strickland.

28  ////

4

Second, respondent contends that Mr. Cosca's decision not to seek a continuance did not fall below a reasonable standard of practice because the likelihood of securing such a continuance until after adoption of Amendment 791, "based on pretext, is sufficiently low that any reasonable attorney would have refrained from trying."  (ECF No. 243 at 7.)  Mr. Ludwig IV does not provide a valid reason the district court would continue sentencing from his plea in April until the following November.  It was improper to seek a delay based on the impending change, because case law suggests district courts should not look to proposed substantive changes to the sentencing guidelines, citing e.g., United States v. Morgan, 376 F.3d 1002 (9th Cir. 2004) (an appellate court may consider an amendment to the Sentencing Guidelines when interpreting a prior version of the Sentencing Guidelines only if that amendment is a clarification of existing law rather than a substantive change in the law); U.S.S.G. § 1B1.11(a) (courts consider the guidelines in place at the time they sentence a defendant).  (ECF No. 243 at 7.)  Because Amendment 791 proposed a future substantive change to the tax loss amounts triggering specific base offense levels in the tax table, it was not proper to apply them where movant was sentenced before the effective date of the changes.  Thus, it would have been improper for Mr. Cosca to request a delay to accomplish the same result.

Further, the district court's obligation to impose sentencing without delay weighed against granting such a request for continuance.  Fed. R. Crim. P. 32(b)(1) (courts "must impose sentence without unnecessary delay"); see also United States v. Flynt, 756 F.2d 1352, 1358 (9th Cir. 1985) ("[t]he decision to grant or deny a requested continuance lies within the broad discretion of the district court"), as amended, 764 F.2d 675 (9th Cir. 1985).  Mr. Ludwig IV fails to demonstrate a legitimate reason Mr. Cosca would have sought such a lengthy continuance in sentencing, particularly given the factors used to decide whether to grant a continuance.  (ECF No. 243 at 8,) Movant cites no authority finding such request legitimate.  Absent a legitimate reason, and the court's interest in prompt sentencing, a reasonable attorney would refrain so moving.  The fact that movant's co-defendants did not sign plea agreements before Congress adopted Amendment 791 is not persuasive or the standard by which Mr. Cosca's representation of Mr. Ludwig IV is based.  In fact, in this case Mr. Cosca stipulated to advance Mr. Ludwig IV's sentencing by two

weeks; absent contrary explanation, the assumption is that Mr. Cosca had a legitimate reason for doing so (as discussed below, movant repeatedly asserted he wanted to be sentenced as soon as possible so he could be transported to Oklahoma).

Finally, movant cannot demonstrate prejudice because the "mere possibility" he "might have received a lower sentence" is insufficient.  (ECF No. 243 at 9-10.)  Mr. Ludwig IV's conclusion that he would have received a lower sentence under Amendment 791 relies on his assumption that every other party to the plea and sentencing process would have made the same decisions as before.  Respondent argues it is mere speculation as to what decisions other parties to the plea negotiations and sentencing process may have made had the PSR reflected an 18 base offense level.  Indeed, the plea agreement expressly left sentencing up to the Court, "including the statutory maximum stated in this plea agreement."  (ECF No. 130, § I.B.)  The prosecutor agreed to recommend an 84-month sentence that was in "the middle of the applicable guidelines range as determined by the Court."  (ECF No. 130, § III.B.1.)  Such a record demonstrates that it is not reasonably probable that but for counsel's failure to delay until Amendment 791 was adopted, Mr. Ludwig IV would have received a lower sentence.  "Indeed, given [defense] counsel's agreement to advance sentencing by two weeks, it is unlikely that counsel saw prejudice in swifter resolution."  (ECF No. 243 at 10.)  Thus, any alleged prejudice is mere speculation.

### 3. Mr. Ludwig IV's Traverse

In his pro se reply, movant argues that on January 28, 2015, three months prior to his acceptance of a plea agreement, he asked Mr. Cosca to look into possible changes in the fraud laws.  Two weeks before such request, the USSC published for public comment a set of proposed Sentencing Guidelines amendments, including changes to section 2T1.1 and 2T4.1.  Mr. Cosca allegedly unreasonably failed to research the pending changes and to incorporate such changes into any trial, plea negotiation, or sentencing strategy.  Mr. Cosca could have:  (1) asked the district court to sentence Mr. Ludwig IV after November 1, 2015; (2) filed a motion seeking a continuance of the sentencing hearing until after November 1, 2015; (3) filed a sentencing memorandum asking the district court to consider Amendment 791, which the court could have granted as a downward variance; (4) sought to withdraw Mr. Ludwig IV's plea based on new

1   facts that became known after Mr. Ludwig IV pled guilty; or (5) delayed the plea negotiations

2   with the prosecutor.  (ECF No. 248 at 2.)

3       Movant argues that the ABA Standards for Criminal Justice, Rule 4-4.1 required Mr.

4   Cosca to investigate and "explore all avenues leading to facts relevant to the merits of the case

5   and the penalty in the event of conviction."  Id.  It was only eight days after Mr. Ludwig IV

6   signed the plea agreement that the USSC submitted the proposed amendment to Congress for

7   review.  The USSC has wide latitude from Congress, and it would have taken both chambers of

8   Congress to stop the amendment from becoming effective.  Absent any opposition to the

9   amendment or bill introduced to stop the amendment, and there was no such bill, it was a virtual

10  certainty that the amendment would come into effect on November 1, 2015.

11      Movant concedes the circumstances in Abney were "vastly different," but argues the case

12  remains persuasive because in Abney the D.C. Circuit found that defense counsel was ineffective

13  by failing to predict that a new federal law would be made retroactive to cases that were still

14  pending when the law became effective.  The law in question in Abney was not a "virtual

15  certainty" such as Amendment 791, yet the court still found defense counsel ineffective.

16      Because Mr. Ludwig IV contends he asked Mr. Cosca about any proposed amendments on

17  January 28, 2015, Mr. Cosca had multiple opportunities to bring Amendment 791 to the court's

18  attention, including at the change of plea and at sentencing.  Such notice would have allowed the

19  district court to continue sentencing or fashion a sentence the court deemed appropriate.  (ECF

20  No. 248 at 4.)  Thus, Mr. Cosca's failure to investigate the proposed amendment, standing alone,

21  demonstrates counsel's performance was deficient.  (ECF No. 248 at 5.)

22      Finally, movant contends that prejudice is plain because reducing Mr. Ludwig IV's base

23  offense level from 20 to 18, his adjusted offense level would have been 19, reducing his advisory

24  guidelines range from 78 to 63 months.  (ECF No. 248 at 5.)  Therefore, Mr. Ludwig IV was

25  eligible to be sentenced to as little as 63 months, a difference of 19 months or a 23% reduction in

26  sentence.  Glover v. United States, 531 U.S. at 203 ("any amount of actual jail time has Sixth

27  Amendment significance").

28  ////

7

1          B. <u>Evidentiary Hearing</u>

2          Prior to the evidentiary hearing, the parties stipulated as follows:  (1) the court can take

3    judicial notice of any documents that appear on the court docket; (2) Mr. Cosca produced no

4    documents that memorialize any discussions between Mr. Cosca and Mr. Ludwig IV before Mr.

5    Ludwig IV entered his plea, or before he was sentenced, about Amendment 791 to the Sentencing

6    Guidelines; (3) Mr. Ludwig IV produced no documents that memorialize any discussion between

7    Mr. Cosca and Mr. Ludwig IV, before he entered his plea, or before he was sentenced, about

8    Amendment 791 to the Sentencing Guidelines; (4) Ms. Coral Hilder, Mr. Cosca's investigator, is

9    the only third party of whom the parties are aware as being present during any discussions

10   between Mr. Cosca and Mr. Ludwig IV about changes to the sentencing guidelines;

11   (5) Respondent does not believe it has any additional communications between Mr. Cosca and the

12   prosecutor Sherry Haus, relevant to this matter, in its possession, other than what it has already

13   produced in discovery; and (6) The parties waive foundation regarding their respective

14   anticipated exhibits, which, for Mr. Ludwig IV's part, were taken from documents provided to the

15   government pursuant to this court's discovery order and were provided again as exhibits to be

16   offered into evidence at the hearing, and which, for the government's part, were documents

17   retrieved from its correspondence files in this matter and provided to Mr. Ludwig IV.  (ECF No.

18   363 at 2-3.)

19         On December 10, 2018, the undersigned held an evidentiary hearing.  (ECF Nos. 370, 378

20   (transcript).)  Movant Mr. Ludwig IV, defense counsel Chris Cosca, and his investigator Ms.

21   Coral Hilder gave testimony.  Over respondent's objection, movant called John Balazs, formerly

22   a defense attorney with the Federal Defender's Office, and now a solo criminal defense attorney

23   specializing primarily in federal criminal defense, both at the trial level, appeals and habeas.

24   (ECF No. 378 at 198.)  The court allowed the witness, but reminded the parties that the court can

25   take into account Mr. Balazs' training and experience in deciding how much weight to give to his

26   opinions.  (<u>Id.</u>)

27   ////

28   ////

8

C. Post-Evidentiary Hearing Briefing

After the evidentiary hearing, the parties submitted the following briefing.

1. Mr. Ludwig IV's Post-Hearing Brief

Movant argues that even if Mr. Cosca was credible, his representation of Mr. Ludwig IV was ineffective in four respects:  during the plea bargaining process (1) Mr. Cosca failed to fully and correctly inform Mr. Ludwig IV of all his options and related consequences; and after Mr. Ludwig IV entered his guilty plea pursuant to the plea bargain, Mr. Cosca (2) failed to seek a continuance of the sentencing hearing; (3) Mr. Cosca failed to argue for the low end of 77 months based on the underlying basis for Amendment 791; and (4) failed to ask the court to apply the range of 62-85 months under Amendment 791.

a. Failure to Properly Inform

There is no document or file note memorializing Mr. Cosca's claim that he informed Mr. Ludwig IV of the impending changes to the Sentencing Guidelines and how such changes could benefit him.  Likewise, there is no writing memorializing Mr. Cosca's claim that Mr. Ludwig IV rejected such benefit in favor of a rush to sentencing.  Mr. Cosca's file only contained calculations of Mr. Ludwig IV's exposure without the guidelines.  (ECF No. 378 at 14-16.) Further, even if the court credits Mr. Cosca's testimony that he informed Mr. Ludwig IV about Amendment 791, the court should find that Mr. Cosca failed to provide sufficient detail to fully advise Mr. Ludwig IV of the benefit of waiting until after November 1, 2015, to enter a plea and be sentenced.  (ECF No. 385 at 16, citing ECF No. 378 at 79, 182.)  Such finding is supported by the testimony of Mr. Balazs, who opined that the standard of care and the prevailing practice among defense attorneys would be to discuss the proposed changes with the defendant.  (ECF No. 378 at 201-02.)

Moreover, movant contends that Mr. Cosca's testimony as to what he told Mr. Ludwig IV was vague, not specific or clear; Mr. Cosca first testified that he informed Mr. Ludwig IV that if he waited to plead, he might benefit.  (ECF No. 378 at 38.)  Mr. Cosca testified:

> I don't specifically remember the verbiage used, but I let [Mr.
> Ludwig IV] know there was a proposal under way that could result
> in a change -- a 2-point change, and he should just wait things out.  It

1
2

> hadn't been finalized, but I was confident that it would change
> because normally these do go through at that point.   And any
> response he gave when a delay was brought up was no.

3   (ECF No. 387 at 28.)  Movant argues that such advice was insufficient because it was vague and

4   couched in terms of possibility and did not relay that the proposed change <u>would have</u> resulted in

5   a two-point reduction in Mr. Ludwig IV's favor once it became effective.  (ECF No. 385 at 19.)

6   Additionally, Ms. Hilder only confirmed that Mr. Cosca told Mr. Ludwig IV he might benefit if

7   he waited, and her testimony was also vague and nonspecific.  (ECF No. 378 at 73-74, 78-79, 82-

8   83.)

9        Movant further contends that Mr. Cosca's testimony was inconsistent.  Although both Mr.

10  Cosca and Ms. Hilder testified that Mr. Cosca advised Mr. Ludwig IV to wait to plead, and Mr.

11  Cosca testified that Mr. Ludwig IV directed Mr. Cosca to pursue a plea bargain against his

12  advice, when Mr. Ludwig IV hesitated during the change of plea hearing because he did not agree

13  with the loss numbers, Mr. Cosca did not take that opportunity to delay to gain benefit from

14  Amendment 791.  Mr. Cosca's note concerning Mr. Ludwig IV's hesitancy does not mention the

15  impending guideline changes.  Mr. Ludwig IV testified that at the change of plea hearing he

16  conferred with Mr. Cosca about getting the intended loss amount under $400,000; Mr. Cosca told

17  Mr. Ludwig IV he should take the plea and take what the prosecutor was offering.  (ECF No. 378

18  at 177.)  If it was Mr. Ludwig IV's objective to get the loss below $400,000 in order to lower

19  exposure by two points, waiting until November 1, 2015, when Amendment 791 became

20  effective, would have accomplished that goal, and Mr. Cosca should have so advised movant.

21  (ECF No. 385 at 24.)

22        In addition, movant argues that the plea agreement should have explicitly noted the

23  impending changes to the sentencing guidelines, and "should have summarized the pre-plea

24  course leading up to the plea in the plea agreement" in order to represent the complete

25  understanding of the parties.  (ECF No. 385 at 17-21, 32.)  Mr. Balazs testified the agreement

26  could be drafted to note the impending amendment, and reserve the right to request that the court

27  "give effect to the amendment through a variance so that the guideline range would be two levels

28  lower and then ask for the bottom of [the] guidelines."  (ECF No. 378 at 205.)  Because the plea

agreement was silent in the plea agreement and not discussed at sentencing, Mr. Ludwig IV
contends the court should infer that Mr. Ludwig IV was not aware of Amendment 791 at the time
he entered his plea.  (ECF No. 385 at 27.)  The record does not confirm that Mr. Ludwig IV
understood what he was giving up in his rush to judgment.  Mr. Cosca's failure to formalize the
impact of Amendment 791 "rendered his representation ineffective."  (ECF No. 385 at 28.)

Likewise, Mr. Ludwig IV contends the court should not find his desire to enter a plea and
be sentenced quickly was absolute.  Mr. Cosca conceded that Mr. Ludwig IV equivocated over
going to trial and taking a plea, and also wrote movant would not sign the plea agreement if his
dad asked him not to.  (ECF No. 385 at 29, 31, citing ECF No. 378 at 43-44, 191-92.)  Mr.
Ludwig IV testified he would have been willing to wait until November 1, 2015, to enter a plea if
the offense level would have been 18 instead of 20; lowering his total sentence was more
important than serving a longer sentence in Oklahoma.  (ECF No. 378 at 146.)

Finally, Mr. Ludwig IV objects that the court should not consider Mr. Cosca's testimony
about any terms of the plea bargain not included in the written agreement, particularly in the
absence of any discovery or testimony from the prosecutor who negotiated the plea agreement
with Mr. Cosca.[1]  Mr. Ludwig IV argues that Mr. Cosca's response as to whether he and the
prosecutor explicitly discussed Amendment 791 was nonresponsive:

Q.  Did you specifically discuss the changes to the tax table?

A.  I did.

Q.  And did Miss Haus?

A.  She recognized them.

(ECF No. 378 at 31.)  Mr. Ludwig IV would benefit from questioning the prosecutor to determine
her position on Amendment 791 and whether it entered into plea negotiations (ECF No. 385 at
35), but only if the court considers terms of the plea bargain not included in the plea agreement.

////

////

---

[1]  At the evidentiary hearing, counsel for movant preserved her Fourteenth Amendment due
process objection based on her inability to cross-examine the prosecutor.  (ECF Nol. 378 at 46.)

1          b. <u>Failure to Seek Continuance of Sentencing</u>

2          Movant contends that Mr. Cosca's failure to seek to continue the sentencing hearing until

3   November 1, 2015, when Amendment 791 became effective was ineffective for four reasons.

4          First, based on Mr. Balazs' expert testimony, Mr. Cosca's duty of care to Mr. Ludwig IV

5   required Mr. Cosca to seek a continuance, given how soon Amendment 791 was to be adopted,

6   and that "the plea agreement left it to the court to determine the applicable guidelines range."

7   (ECF No. 385 at 36-37, citing ECF No. 378 at 209, 210-11.)  Because the plea agreement, PSR,

8   and sentencing transcript all fail to address Amendment 791, "it is reasonably likely" that the

9   district judge was not aware of Amendment 791 or how it would impact movant's sentence.

10  (ECF No. 385 at 38.)  Ms. Hilder testified that in one of the meetings with Mr. Ludwig IV, Mr.

11  Cosca "indicated he believed the other defendants were also waiting for this change to become

12  effective."  (ECF No. 385 at 74.)  Mr. Cosca confirmed that movant's co-defendants -- defendants

13  Harned and Mullin -- received benefit of Amendment 791.  (ECF No. 385 at 45).  Such testimony

14  supports Mr. Balazs' expert testimony that it was the standard of care for Mr. Cosca to avail

15  himself of impending sentencing guideline changes that would benefit a defendant.  Mr. Cosca

16  testified that he did not seek a continuance or investigate the history of success of defense counsel

17  making such requests in the Eastern District.  (ECF No. 378 at 38-39.)  Mr. Cosca's failure to do

18  so speaks to his failure to adequately advise Mr. Ludwig IV concerning his rush to judgment.

19         Further, movant asserts that Mr. Cosca's preoccupation with the sophisticated means

20  enhancement as his reason to forego seeking such a continuance is a "red herring" to all of Mr.

21  Ludwig IV's ineffective assistance of counsel claims for three reasons:  (1) Mr. Ludwig IV

22  "disagreed that the sophisticated means enhancement applied to him, and that was his decision to

23  make and his risk to assume in the plea bargain"; (2) "after November 1, 2015, even if the

24  sophisticated means enhancement would have applied to Mr. Ludwig IV, he would have been no

25  worse off, because gaining two points for the sophisticated means enhancement would merely

26  have been offset by the loss of two points based on the new tax tables"; and (3) it would have

27  been even more unlikely that the sophisticated means enhancement would have applied to him

28  ////

1   after Amendment 792 took effect, narrowing the circumstances under which the enhancement

2   could be applied."  (ECF No. 385 at 46.)

3          Second, despite Mr. Cosca's testimony that Mr. Ludwig IV pushed Mr. Cosca to resolve

4   this case as soon as possible, Mr. Cosca did not testify that he informed Mr. Ludwig IV that if he

5   waited until after November 1, 2015, the applicable sentencing guidelines would be 15 months

6   lower.  Rather, Mr. Cosca's testimony, corroborated by Ms. Hilder, was that "if" Mr. Ludwig IV

7   waited, he "might" benefit.  (ECF No. 378 at 73-74; 78-79.)  Such testimony fails to demonstrate

8   that Mr. Cosca fully informed Mr. Ludwig IV of the consequences of not seeking to continue the

9   sentencing hearing.  There was nothing in the plea agreement that precluded Mr. Cosca from

10   requesting a continuance of the sentencing hearing.  By failing to address the impending

11   Amendment 791 in the plea agreement, Mr. Ludwig IV argues that Mr. Cosca and the prosecutor

12   "essentially hid the issue from the court and [Mr. Ludwig IV]."  (ECF No. 385 at 59.)  Even

13   assuming Mr. Ludwig IV was aware of the pending amendment, the written plea agreement was

14   silent on the issue, and Mr. Cosca's advice that Mr. Ludwig IV might benefit if he waited was

15   insufficient to cure such omission.  (ECF No. 385 at 59.)

16          Third, Mr. Balazs opined that the district judge would have granted a request to continue

17   the sentencing hearing, particularly if Mr. Cosca disclosed that Amendment 791 was submitted to

18   Congress on April 30, 2015.  (ECF No. 378 at 211.)  Mr. Ludwig IV could have argued that no

19   other defendant had yet been sentenced, and that the proposed changes to the sentencing

20   guidelines were to "adjust[] the tax tables for inflation through 2014 so that they would no longer

21   overstate the seriousness and harm of the offense, and therefore a defendant's culpability, based

22   on the monetary values involved."  (ECF No. 385 at 49.)

23          Fourth, Amendment 791 contemplated a two-point reduction in Mr. Ludwig IV's base

24   offense level.  (ECF No. 385 at 50-51.)

25                    c. Failure to Argue at Sentencing

26          Mr. Ludwig IV contends that, at sentencing, Mr. Cosca should have argued for the low

27   end of 77 months based on the effects of inflation reflected in the tax tables, the underlying basis

28   for Amendment 791.  While Mr. Cosca argued for the low end based on the mitigating effects of

Mr. Ludwig IV's addiction, he failed to argue the underlying basis for Amendment 791.  Mr.

Cosca conceded that under the terms of the plea agreement he was permitted to argue the low

end, and his sole explanation was the fact that the prosecutor was not including sophisticated

means as an enhancement.  (ECF No. 385 at 52-53, citing ECF No. 378 at 52-53, 67-68, 131-32.)

      Yet, when asked if Mr. Ludwig IV was sentenced on or after November 1, 2015, whether

the duty of care would have required Mr. Cosca to argue that the new tax tables applied, Mr.

Cosca responded:

> A.  You mean after those guidelines went into effect?
> Q.  Yes.
> A.  Of course.
> Q.  Even though the plea agreement stated a range of 77 to 96?
> A.  I see what you are saying.
> Q.  Yes.
> A.  I don't know.

(ECF No. 378 at 134-35.)  Balazs opined that, based on a hypothetical where the defendant

entered a plea bargain setting forth a sentencing range of 77 to 96 months, but allows counsel for

defendant to argue for the lower term of 77 months, and the sentencing takes place before the

effective date of the new sentencing guidelines which would have lowered the sentence range by

15 months, the failure of Mr. Cosca to argue for the lower end of 77 months based on impending

Amendment 791 would violate the standard of care.  (ECF No. 378 at 211-12.)  However, Mr.

Cosca denied he had a duty of care to make this argument again based on the sophisticated means

enhancement:

> I didn't want the judge to hear anything from the prosecuting attorney
> about how sophisticated the case was and then possibly cause an
> increase in the sentence within the guidelines.  Because the
> agreement with the government was no sophisticated means, stick
> with the current guidelines, and that was the deal.  So if I started to
> argue contrary to that position at sentencing, then I feared that could
> open the door to the government bringing out all of these aggravating
> facts and causing Judge Mueller to even go higher than mid-range.

(ECF No. 378 at 130-31.)  But the written plea agreement expressly states it is the sole agreement

between the parties unless it is committed to writing and signed by the defendant, and counsel for

the defendant and the government.  (ECF No. 130 at 10.)  Thus, any "side-agreement" Mr. Cosca

may have struck with the prosecutor violates the written terms of the plea agreement, and would

14

1    not have been agreed to by Mr. Ludwig IV had he been fully informed.  Any ambiguity in the

2    agreement must be construed in Mr. Ludwig IV's favor.  (ECF No. 385 at 57.)

3                            d. Failure to Ask Court to Apply Amendment 791

4            Mr. Ludwig IV argues it was ineffective assistance of counsel not to ask the district court

5    to apply the sentencing range set forth in Amendment 791, even if not yet effective.  Mr. Balazs

6    testified it is common practice for defense attorneys in the Eastern District of California to so

7    argue.  The plea agreement precluded Mr. Cosca from asking the court to apply 18 U.S.C. § 3553

8    sentencing factors "to arrive at a different sentence than that called for under the advisory

9    guideline range as determine by the court."  (ECF No. 385 at 60, quoting ECF No. 130 at 9.)

10   However, Mr. Balazs opined that:

11             where the guidelines changes are based on some kind of empirical
               data or studies or information to determine that, in fact, they are too
12             high at that time[,] . . . it is fairly common practice to use that
               information to argue for a lower sentence.  I think that it would fall
13             under 3553(a). . . in terms of the severity and nature of the offense,
               now you have the Commission determining that because they
14             weren't involved in inflation, the effect of the amount of the loss may
               overstate the seriousness of the offense.  So I think it would fall under
15             that rubric under 3553(a).

16   (ECF No. 378 at 220-21 (analogizing to past guideline changes in context of crack cocaine

17   guidelines and drug guidelines)).  Mr. Balazs also testified that if during plea negotiations the

18   government opposed arguing such pending change, the duty of care would require defense

19   counsel to argue for the amendment under § 3553(a), and defense counsel would have to discuss

20   with the client whether to take the plea under such circumstances.  (ECF No. 378 at 221-22.)

21   There is no evidence that such conversation took place, or that "there was a quid pro quo trading

22   the new tax table for no sophisticated means enhancement."  (ECF No. 385 at 64.)  The plea

23   agreement expressly provided that the sentencing judge would determine the appropriate

24   sentencing range.  The plea agreement allowed Mr. Cosca to argue the lower term of 77 months

25   based on the sentencing range stipulated in the plea agreement, as well as to argue the lower term

26   of any sentencing range the court determined applicable.  (ECF No. 385 at 64, citing ECF No.

27   130 at 5:13-14.)  Under either scenario, Mr. Ludwig IV "would likely have been better off."

28   (ECF No. 385 at 64.)

                                                    15

1          2.  Respondent's Post-Hearing Brief[2]

2                a.  Mr. Cosca's Performance was Competent

3          Respondent opposes the § 2255 motion because Mr. Ludwig IV has not shown that Mr.

4   Cosca's representation fell below an objective standard of reasonableness.  Respondent contends

5   that at the evidentiary hearing, Mr. Cosca testified that he was aware of the upcoming changes to

6   the sentencing guidelines (Amendment 791), which would become effective in about a year, and

7   had the potential to lower the base offense level two points; Mr. Cosca informed Mr. Ludwig IV

8   about the change and how it could affect Mr. Ludwig IV's sentence; Mr. Cosca advised Mr.

9   Ludwig IV to delay his plea process to take advantage of the change, but Mr. Ludwig IV, having

10  heard and understood the advice, indicated he did not want to wait, but wanted to be sentenced as

11  soon as possible in order to return to Oklahoma so his daughter could visit him.  (ECF No. 390 at

12  9-10, citing ECF No. 378 at 27-28.)  Both the testimony of Coral Hilder and Mr. Ludwig IV's

13  correspondence supports this history of events.  "The evidence in this case flatly refutes [Mr.

14  Ludwig IV's] claim that Mr. Cosca never advised him of Amendment 791's changes 'at all.'"

15  (ECF No. 390 at 10, citing ECF No. 378 at 150.)

16                i.  Mr. Cosca Informed Mr. Ludwig IV About Amendment 791

17         Mr. Cosca "testified unequivocally that he was aware of Amendment 791's proposed

18  change to the guidelines, that he had researched it, and . . . then informed [Mr. Ludwig IV] about

19  it."  (ECF No. 390 at 10, citing ECF No. 378 at 21-22, 26-28.)  Mr. Cosca testified he could have

20  become aware of the proposed change from any number of sources, noting that changes to the

21  guidelines benefitting defendants are "hot topics" in the legal community, but was certain he had

22  taken his knowledge of the proposed change to Mr. Ludwig IV.  (ECF No. 390 at 10, citing ECF

23  No. 378 at 27-28.)  Mr. Cosca testified he was going to use Amendment 791 "to attempt to

24  convince the U.S. Attorney to use a proposed guideline change in the calculations.  In the

25  alternative, I was going to try to convince Mr. Ludwig IV just to wait things out so he may get the

26

27  ─────────────────
    [2]  Initially, respondent argued that movant abandoned initial claims raised in movant's pro se
28  briefing because movant did not include such arguments in the opening brief, which movant
    denies.  The court finds respondent's argument unpersuasive.

1    benefit." (ECF No. 378 at 28.)  Mr. Cosca confirmed that his duty to Mr. Ludwig IV was to

2    "make sure he's fully advised and clarify his options . . . . ultimately the decision is his."  (ECF

3    No. 378 at 43.)

4         Also, Ms. Hilder's "unimpeached testimony corroborates" Mr. Cosca's testimony.  (ECF

5    No. 390 at 10.)  Ms. Hilder was present when Mr. Cosca informed Mr. Ludwig IV of the

6    proposed guidelines changes (ECF No. 378 at 73), explained how they could "benefit" Mr.

7    Ludwig IV, and advised Mr. Ludwig IV, multiple times, to wait for the change to become

8    effective.  (ECF No. 378 at 73-74.)  Although Ms. Hilder could not recall specific sentencing

9    numbers, Ms. Hilder recalled that Mr. Cosca advised Mr. Ludwig IV about the upcoming

10   changes, the potential benefit to wait to plead, and Mr. Ludwig IV's clear indication he would not

11   follow that advice.  Respondent contends that Mr. Ludwig IV's "citing the qualitative character of

12   Ms. Hilder's recollection to argue that Mr. Cosca's advice was 'vague' conflates the sharpness of

13   Ms. Hilder's current memory, four years on, with the clarity of Mr. Cosca's advice in the

14   moment."  (ECF No. 390 at 10.)  In any event, Ms. Hilder's recollection is sufficiently complete

15   to refute Mr. Ludwig IV's claim that Mr. Cosca never advised Mr. Ludwig IV "at all" about the

16   upcoming guidelines change and the benefits of waiting.  (ECF No. 378 at 150, 157; ECF No. 206

17   at 15-16.)  Moreover, Ms. Hilder's recollection of Mr. Ludwig IV's response to Mr. Cosca's

18   advice "was anything but vague."  (ECF No. 390 at 11, citing ECF No. 378 at 75-76.)

19        Mr. Ludwig IV's initial § 2255 claim was not that Mr. Cosca's advice was "vague," but

20   that Mr. Cosca had not researched the change and said no change existed.  In the § 2255 motion,

21   Mr. Ludwig IV contends he raised the issue of the guidelines change with Mr. Cosca "on

22   numerous occasions between April 7, 2014, and July 8, 2015," asking him to research it, but Mr.

23   Cosca responded he was aware of no such change.  (ECF No. 206 at 15-16; 27-28 (Mr. Ludwig

24   IV's Decl.).)  At the evidentiary hearing, Mr. Ludwig IV testified that when he asked Mr. Cosca

25   about the rumored change during personal visits, Mr. Cosca "said nothing at this time was going

26   on."  (ECF No. 378 at 144.)  Mr. Cosca "did not bring up the changes to -- the amendments to the

27   guidelines to me at all, sir."  (ECF No. 378 at 150.)  But Mr. Ludwig IV's testimony is impeached

28   by the testimony of both Mr. Cosca and Ms. Hilder.  (ECF No. 390 at 12.)

17

1               ii.  <u>Mr. Ludwig IV's Letters Omitted References to Amendment 791</u>

2         Mr. Ludwig IV's allegation that Mr. Cosca failed to research the upcoming changes to the

3 guidelines despite requests to do so is belied by the record.  Mr. Cosca testified that he researched

4 the proposed guidelines change, which is how he was able to discuss it with Mr. Ludwig IV.

5 (ECF No. 378 at 27-28.)  Ms. Hilder testified she never heard Mr. Ludwig IV ask Mr. Cosca to

6 research this issue (ECF No. 378 at 76), and Mr. Ludwig IV did not include any such request in

7 his writing to Mr. Cosca.  Upon cross-examination as to why his letters are devoid of any such

8 request, Mr. Ludwig IV testified that:  (1) he had heard only rumors and took Mr. Cosca's word

9 that no such changes existed; and (2) he had no way of researching the rumors, aside from asking

10 Mr. Cosca.  (ECF No. 378 at 148-50.)  Respondent argues that Mr. Ludwig IV's testimony does

11 not withstand scrutiny for two reasons.

12         First, Mr. Ludwig IV is not credible because "accepting Mr. Cosca's answer without

13 further discussion would be inconsistent with how Mr. Ludwig IV approached every other aspect

14 of his case."  (ECF No. 390 at 13.)  Respondent cites multiple examples where Mr. Ludwig IV

15 wrote Mr. Cosca about issues they had already discussed:  sentencing exposure, guidelines

16 calculations, enhancements for leadership role, loss amounts, sophisticated means, and the

17 progress of plea negotiations with the prosecutor.  (ECF No. 390 at 13, citing Exs. C (May 25,

18 2014), D (June 10, 2014), G (July 7, 2014), H (July 31, 2014), 2 (Sept. 3, 2014), K (Sept. 25,

19 2014), S-002 (Feb. 4, 2015), 5 (Feb. 25, 2015), & EE (May 19, 2015).)  At least twice, Mr.

20 Ludwig IV wrote Mr. Cosca letters attaching lists of items he wanted Mr. Cosca to collect,

21 research or investigate.  (ECF No. 390 at 14, citing Ex. E-002-004 (June 15, 2014); Ex. Q-002

22 (Jan. 14, 2015).)  "Glaring by its omission from these lists -- or any of [Mr. Ludwig IV's]

23 correspondence -- is any reference to research on the rumored guidelines changes."  (ECF No.

24 390 at 14.)  Respondent contends that the reason Mr. Ludwig IV's letters do not reference the

25 rumored guidelines changes is because Mr. Cosca had discussed the impending changes and its

26 potential benefit with Mr. Ludwig IV, who adamantly refused to wait for the benefit of a

27 proposed change that was nearly a year away.  (ECF No. 390 at 14.)

28 ////

1   Second, Mr. Ludwig IV's claim that Mr. Cosca was his sole source for investigation into

2   the guidelines is belied by the record that demonstrates Mr. Ludwig IV had access to some of his

3   co-defendants, and his correspondence impeaches his testimony that he did not discuss various

4   issues with his co-defendants.  (ECF No. 378 at 151-54, 164, 171; Ex. 2, Ex. 6, Ex. O.)  If it was

5   true Mr. Ludwig IV had heard rumors, but Mr. Cosca claimed the changes were "not happening,"

6   it is unlikely Mr. Ludwig IV would not have started asking around and sending letters to Mr.

7   Cosca about it.

8   Mr. Ludwig IV's testimony that if he had known about the potential reduction in

9   guidelines exposure, he would have delayed his plea because lowering his sentence was more

10   important than serving a longer sentence in Oklahoma, makes Mr. Ludwig IV's "placid

11   acceptance of Mr. Cosca's dismissing the rumors even less plausible."  (ECF No. 390 at 15, citing

12   ECF No. 378 at 157:16-17 ("He said nothing was going on at this time so that appeased me.")

13   Mr. Ludwig IV would have wanted to know how the potential changes affected his sentence, and

14   his father's sentence, as evidenced by the multiple times Mr. Ludwig IV expressed concern about

15   his father's case.  (ECF No. 390 at 15, citing Exs. S, NN, OO.)  Mr. Ludwig IV already knew

16   about the proposed two-level reduction to the tax table because Mr. Cosca informed Mr. Ludwig

17   IV about it, but Mr. Ludwig IV made the informed decision not to delay his plea until

18   Amendment 791 went into effect.

19   iii.  Mr. Cosca's Failure to Include Amendment 791 in the Plea Agreement

20   Respondent first objects that Mr. Ludwig IV's claim that Mr. Cosca was ineffective for

21   failing to incorporate the discussion of Amendment 791 in the plea agreement is a new claim that

22   misstates the terms and purpose of the plea agreement.  (ECF No. 390 at 15.)  Rather, the written

23   plea agreement recorded terms upon which the parties agreed; including anticipated amendments

24   or explanations of how the attorneys arrived at their final agreement would have created

25   confusion and ambiguity.  "To a large extent . . . horse trading [between prosecutor and defense

26   counsel] determines who goes to jail and for how long."  Missouri v. Frye, 566 U.S. 134, 143-44

27   (2012).  Moreover, the prosecutor offered only an 84 month sentence; asking her to include the

28   impact of Amendment 791 which reduced the sentencing range to 63-78, would be viewed as an

1  attempt to modify agreed terms, and risked having her "reintroduce at least the sophisticated

2  means enhancement, and possibly others."  (ECF No. 390 at 16.)

3      Additionally, discussing Amendment 791 in the plea agreement would have created

4  ambiguity as to the controlling sentencing terms.  Contrary to Mr. Ludwig IV's argument, the

5  written plea agreement sets forth the agreed-upon guidelines range, using the existing sentencing

6  guidelines.  "Even [Mr. Ludwig IV's] expert, through several modified hypotheticals, ultimately

7  testified that the parties' discussion of the guidelines and agreements thereon would be

8  memorialized in the guidelines estimate in the agreement, and not as a series of caveats

9  explaining every possible sentencing variable that the parties have discussed and discarded."

10 (ECF No. 390 at 16-17, citing ECF No. 378 at 229.)[3]  Under these circumstances, Mr. Cosca's

11 failure to introduce ambiguity into the plea agreement does not constitute ineffective

12 representation.

13          iv.  Mr. Cosca's Arguments at Sentencing

14      Respondent contends that the court should defer to Mr. Cosca's strategic and

15 straightforward rationale for his arguments at sentencing.  Defense counsel are not required to

16 make every conceivable argument at sentencing, and the standard of care requires that any

17 proposed sentencing argument not violate the plea agreement.  If Mr. Cosca argued consideration

18 of Amendment 791 at sentencing, either to lower the sentencing range or to support a low-end

19 sentence, it would have "contravened the terms of the plea agreement" and would not serve as "a

20 proper basis for a 3553(a) variance."  (ECF No. 390 at 17.)  Mr. Cosca was concerned that the

21 prosecutor would view any such argument "as a breach of both the letter and spirit of the plea

22 agreement."  (Id., citing ECF No. 378 at 108-09.)  In plea negotiations with the prosecutor, Mr.

23 Cosca discussed the potential guidelines change but she "rejected the suggestion of a guidelines

24 range that would not allow for an 84-month sentence."  (ECF No. 390 at 17, citing ECF No. 378

25

26 [3]  Respondent preserved its objection that expert testimony is not necessary to determine claims
   of ineffective assistance of counsel, and because the court is qualified to understand the legal
27 analysis required by Strickland, the court may exclude expert testimony related to such analysis.
   (ECF No. 378 at 195.)

28

1  at 30; see also Ex. 1 at 2.)  When asked why Mr. Cosca did not have a duty of care to argue for 77

2  months based on the pending changes to the tax table under the circumstances, Mr. Cosca

3  explained he did not want to give the prosecutor a basis to revive any enhancements or to void the

4  agreement.  (ECF No. 378 at 130-31.)

5          Other than Mr. Balazs' testimony,[4] Mr. Ludwig IV offered no legal authority to support

6  Mr. Ludwig IV's claim that proposed changes to the sentencing guidelines are an appropriate

7  basis for arguing for the low end of the guidelines range, a downward variance under 18 U.S.C.

8  § 3553(a), or that failure to make such argument demonstrates that Mr. Cosca breached his duty

9  of care.  Indeed, § 3553(a) specifically refers to "the guidelines "that . . . are in effect on the date

10  the defendant is sentenced."  (ECF No. 390 at 18, quoting 28 U.S.C. § 3553(a)(4) & (5).)

11  Respondent objects that Mr. Balazs' testimony was unhelpful because the hypotheticals "omitted

12  numerous key facts and allowed reasonable legal minds to choose different strategies, depending

13  on the particular circumstances."  (ECF No. 390 at 19.)  For example, despite testifying that there

14  could be circumstances where the failure to argue a two-step reduction under Amendment 791

15  fell below the standard of care, Mr. Balazs also testified that if the prosecution absolutely refused

16  to give effect to such changes, then defense counsel would have to ask to argue for the

17  amendment under § 3553(a).  (ECF No. 390 at 19, citing ECF No. 378 at 222.)  On cross-

18  examination, Mr. Balazs conceded that if during pre-plea discussions the prosecutor agreed that

19  as part of the plea offer she would not ask for an enhancement and refused to give effect to the

20  guideline amendment, then the prosecutor "could potentially try to argue for some other

21  enhancements unless . . . bound by the plea agreement not to argue for enhancements."  (ECF No.

22  378 at 226.)  Mr. Cosca testified that the prosecutor would not entertain guidelines that did not

23  include a sentence of 84 months, which is corroborated by the prosecutor's email recommending

24  an 84-month sentence.  (ECF No. 378 at 30-33; Ex. V.)  Based on the prosecutor's position and

25  agreement, Mr. Cosca could not argue for a two-point reduction under impending Amendment

26  791, which provided a sentencing range of 63-78 months, without risking the prosecutor arguing

27

28  [4]  Respondent again objects to movant's use of Balazs' testimony in lieu of legal authorities to support his claims.

21

for additional sentencing enhancements.  (ECF No. 390 at 19.)  Instead, Mr. Cosca argued for the low end of the sentencing range based on Mr. Ludwig IV's addiction issues.  Mr. Ludwig IV cannot demonstrate that the prosecutor's arguments and the court's ultimate sentence would have been lower or remained the same had Mr. Cosca delayed to take advantage of Amendment 791.  (ECF No. 390 at 20.)  Taken in context, "Mr. Cosca's decision was informed, reasoned and strategic."  (Id.)

v.  It Is Not Ineffective to Proceed According To Client's Wishes

Mr. Cosca informed Mr. Ludwig IV of the potential benefits of waiting for Amendment 791 to be enacted, was satisfied Mr. Ludwig IV understood the "tradeoff he was making by choosing the earlier plea," and diligently set about "expedit[ing] the plea and sentencing process as [Mr. Ludwig IV] demanded."  (ECF No. 390 at 20.)

i.  Mr. Ludwig IV's Choice to Advance Plea Was Informed

Despite Mr. Cosca's advice to delay the plea, for over a year Mr. Ludwig IV insisted he wanted to resolve his case quickly so he could get back to Oklahoma to be near his daughter.  (ECF No. 390 at 20, citing Mr. Cosca's testimony at ECF No. 378 at 28, 47, 60, 75, 78-79, 91, 95, and 116, and Mr. Ludwig IV's testimony at ECF No. 378 at 165, 172.)  Respondent also cites Mr. Ludwig IV's own correspondence confirming such wishes.  (Ex. A, H, 2, 6.)

Once Mr. Ludwig IV had the proposed plea agreement, Mr. Ludwig IV repeatedly wrote to Mr. Cosca stating he was willing to accept the 84-month offer and get sentenced without further delay.  (Ex. 5 (Feb. 15, 2015:  "I have said since May of last year that I would sign for 84 months."); Ex. 6 (Mar. 12, 2015:  "I am hoping to get this deal done ASAP.")  At the change of plea hearing, when Mr. Ludwig IV indicated he wanted to revisit the loss amount, presumably to lower the base offense level, Mr. Ludwig IV decided to proceed with the plea when Mr. Cosca advised that re-negotiating the facts could delay the plea.  Such decision is significant because when Mr. Ludwig IV thought he might be able to reduce his sentence by recalculating the loss amount, but was advised by Mr. Cosca it would create uncertain delay, Mr. Ludwig IV chose to enter the plea rather than delay further.  (ECF No. 390 at 21.)  Mr. Ludwig IV's decision at the change of plea hearing is consistent with Mr. Cosca's testimony as well as Mr. Ludwig IV's own

22

1    testimony and correspondence, and rebuts Mr. Ludwig IV's current claim that had he known

2    about Amendment 791 he would have delayed his plea.

3         Respondent argues that Mr. Ludwig IV's efforts to undermine Mr. Cosca's position that

4    Mr. Ludwig IV was adamant about advancing his plea and sentencing are unpersuasive.  While

5    Mr. Ludwig IV noted some "deal breakers" in entering a plea, such as whether the plea might hurt

6    his father, or if his father asked Mr. Ludwig IV not to plead (ECF No. 385 at 30-31); but waiting

7    to take advantage of Amendment 791, which would have kept Mr. Ludwig IV from his daughter,

8    was apparently not something he was willing to do.  (ECF No. 390 at 22.)  Respondent

9    acknowledged that Mr. Ludwig IV postured about going to trial, but Mr. Cosca viewed such

10   posturing as a tactic to speed up negotiations.  (ECF No. 378 at 58-59; see also Exs. 4, 5.)

11   Because Mr. Ludwig IV was clearly guilty, trial was not a viable option, and Mr. Ludwig IV

12   "would have been hammered at sentencing" due to his criminal history, the details of the fraud

13   scheme, "his duping his father into it," "evidence he attempted to conceal his offense," and "the

14   loss of the three-point reduction for acceptance of responsibility he received through the plea

15   process."  (ECF No. 390 at 22, citing ECF No. 378 at 58, 98; see also Ex. 4 at 1-2 (Dec. 24, 2014:

16   "You and I both know we can't beat the case but we also know that it's a big mess.").)  Mr.

17   Ludwig IV's "talk of trial was just one more way [Mr. Ludwig IV] conveyed that resolving his

18   case quickly was more important than waiting for a potential two-point reduction."  (ECF No. 390

19   at 22.)

20                              ii.  Post-Plea Agreement Advice Was Proper

21        Once the plea agreement was in place, "the context in which Mr. Cosca did counsel

22   against delay was materially different."  (ECF No. 390 at 22.)  Mr. Cosca had negotiated to

23   minimize the risk of additional enhancements, and any delay to take advantage of Amendment

24   791 could have been viewed as an attempt to alter the plea agreement.  The prosecutor was not

25   charitably disposed to Mr. Ludwig IV given his lack of remorse, and rejected application of the

26   upcoming guidelines change.  (ECF No. 378 at 31-32; see also Ex. V.)  At sentencing the district

27   judge noted the sophistication of the fraud scheme and that Mr. Ludwig IV was the leader.  (Ex.

28   HH-003.)  Thus, had the prosecutor argued for a sophisticated means enhancement, the district

                                                    23

1   judge may have applied it, demonstrating why Mr. Cosca negotiated with the prosecutor not to

2   include such enhancement in the plea agreement, and Mr. Cosca was surprised the prosecutor

3   agreed.  (ECF No. 378 at 67, 90-91, 107-09.)  Mr. Cosca was also concerned that the prosecutor

4   could argue for an obstruction enhancement, recommend the high end of the guidelines or decide

5   to take the matter to trial.  (ECF No. 378 at 92, 97-98.)  In the face of such risks, Mr. Cosca's

6   decision not to delay was competent representation.

7            Respondent denies that Amendment 792 would have decreased the risk of a sophisticated

8   means enhancement.[5]  Rather, "Amendment 792 narrowed application of the sophisticated

9   enhancement to a defendant's own conduct, rather than the conduct attributed to a conspiracy."

10  (ECF No. 390 at 23.)  Despite Mr. Ludwig IV's contrary belief, Mr. Cosca advised Mr. Ludwig

11  IV such enhancement was a real danger; Mr. Cosca was aware of this risk, in part, because he

12  discussed it with the prosecutor, and negotiated for it not to appear in the plea agreement.  (ECF

13  No. 378 at 107.)  It is undisputed Mr. Ludwig IV was the leader of the scheme.  (Ex. HH-003; see

14  also USSC, 2015 Amendments to the U.S. Sentencing Guidelines, p. 25.[6])  Thus, Amendment

15  792 did not alter Mr. Cosca's assessment that the sophisticated means enhancement could apply

16  to Mr. Ludwig IV, who Judge Mueller expressly identified as "the leader."  (Ex. HH-003.)

17                          iii.  Improper to Delay Plea for Pretextual Reason

18          Mr. Ludwig IV fails to offer any valid reason the court would continue the sentencing

19  from April until November 1, 2015, other than Mr. Balazs' opinion that the district court would

20  have granted the continuance to take advantage of Amendment 791.  (ECF No. 390 at 24.)  Ninth

21  Circuit case law suggests such an argument would be improper.  See, e.g., United States v.

22  Morgan, 376 F.3d 1002 (9th Cir. 2004) (holding appellate court may consider an amendment to

23

24  [5]  Respondent objects to movant's new argument concerning Amendment 792 because it was
    raised by counsel for the first time during the evidentiary hearing.  (ECF No. 390 at 23 n.7.)

25

26  [6]  "Based on this language, courts had applied this enhancement on the basis of the sophistication
    of the overall scheme without a determination of whether the defendant's own conduct was
27  'sophisticated.' [Citations omitted] The Commission concluded that basing the enhancement on
    the defendant's own intentional conduct better reflects the defendant's culpability and will
28  appropriately minimize application of this enhancement to less culpable offenders."  Id.

1    the Sentencing Guidelines when interpreting a prior version of the Sentencing Guidelines only if

2    that amendment is a clarification of existing law rather than a substantive change in the law).

3    Rather, courts consider sentencing guidelines in place at the time of sentencing.  See USSG

4    § 1B1.11(a).  Because Amendment 791 proposed a future substantive change to the tax loss

5    amounts, it would be improper for the court to consider it at sentencing or for counsel to seek a

6    continuance on that basis.  (ECF No. 390 at 24.)

7            In addition, the court's obligation to sentence defendants without unnecessary delay

8    weighed against such request.  Fed. R. Crim. P. 32(b)(1) (courts "must impose sentence without

9    unnecessary delay"); see also United States v. Flynt, 756 F.2d 1352, 1358 (9th Cir. 1985) ("[t]he

10   decision to grant or deny a requested continuance lies within the broad discretion of the district

11   court"), as amended, 764 F.2d 675 (9th Cir. 1985).  Under the several factors courts employ to

12   decide whether a continuance is warranted (ECF No. 390 at 25), movant fails to demonstrate that

13   a four-month sentencing delay was warranted or would be granted.  Rather, Mr. Ludwig IV

14   argues Mr. Cosca should have used a pretextual excuse for the delay to ask for a reduced base

15   offense level, without citing any legal authority in support.  (ECF No. 390 at 25.)

16           But even assuming the impending Amendment 791 was a proper basis to seek delay, such

17   request for delay would have violated Mr. Ludwig IV's wishes and given the prosecutor a basis to

18   allege breach of the plea agreement, militating against such action.  In light of the prosecutor's

19   rejection of the pending guidelines, Mr. Cosca would have had to seek a stipulation from the

20   prosecutor or file a motion, which the prosecutor could oppose.  "From Mr. Cosca's point of

21   view, the government may have viewed attempting to do so either as bad-faith avoidance of the

22   plea agreement's explicit sentencing guidelines terms."  (ECF No. 390 at 26.)  No reasonable

23   defense attorney would choose that strategy when faced with a client who was a six-time

24   convicted felon, who professed he found financial crimes "fun," and was the undisputed leader of

25   a fraud scheme in which he involved his own father.  (ECF No. 390 at 26, citing Ex. V, V-034.)

26   The only other option would have been to create a pretextual reason for the delay, which would

27   breach Mr. Cosca's duty of candor to the court.  Failing to take such steps does not demonstrate

28   ineffectiveness.

1    Finally, respondent refutes movant's argument concerning his co-defendants,[7] because the

2    evidence demonstrates he was aware of Amendment 791 yet insisted on seeking an early plea and

3    sentence anyway, and the reasonableness of Mr. Cosca's performance is based on the

4    circumstances of his representation, not the performance of attorneys for other defendants.

5    Strickland, 466 U.S. at 688 (the performance inquiry necessarily turns on "whether counsel's

6    assistance was reasonable considering all the circumstances.")  Mr. Cosca had many reasons to

7    believe that any two-level decrease gained by tactical delay risked the application of additional

8    sentencing enhancements and the goodwill with the prosecutor, and therefore exercised his

9    reasonable professional care by not asking for delay.

10          b.  Mr. Ludwig IV Cannot Demonstrate Prejudice

11    Even if the court finds credible that Mr. Cosca never once discussed Amendment 791 with

12    Mr. Ludwig IV, he cannot demonstrate prejudice because his arguments are based on

13    "assumption, conjecture, and selective exclusion of the facts," and the "mere possibility" that he

14    "might have received a lower sentence."  (ECF No. 390 at 27.)  Rather, movant is required to

15    show that there is a "reasonable probability" sufficient to undermine confidence in the outcome,

16    which is a "rigorous and highly demanding" standard.  (ECF No. 390 at 27, citations omitted.)

17    Movant cannot so demonstrate because he assumes that "every other party to the plea and

18    sentencing process would have kept all terms and conditions identical," and the court would have

19    responded to those terms in the same way, all while ignoring Mr. Ludwig IV's culpability and

20    history.  (ECF No. 390 at 28.)  "[A]ny two-point reduction" under Amendment 791 "would likely

21    have been offset by disrupting the plea Mr. Cosca had negotiated," making Mr. Ludwig IV

22    "vulnerable to additional sentencing enhancements and a high-end sentence, or worse, if the

23    government had decided to take the case to trial, at which [Mr. Ludwig IV] was sure to be

24    ////

25    _____

26    [7]  Respondent points out that movant takes as true Ms. Hilder's testimony that "Mr. Cosca
      indicated he believed the other defendants were also waiting for this change to become effective,"

27    which acknowledges that it was during this conversation that Mr. Cosca told movant about
      Amendment 791, yet omits Ms. Hilder's subsequent testimony confirming movant did not want

28    to wait.  (ECF No. 390 at 26, quoting ECF No. 385 at 38; 378 at 74-75.)

26

convicted."  (ECF No. 390 at 6.)  Such speculation by Mr. Ludwig IV is insufficient to

demonstrate prejudice under Strickland.

### 3.  Mr. Ludwig IV's Post-Hearing Reply

#### a.  During Plea Bargaining, Mr. Cosca Failed to Fully & Correctly Inform Mr. Ludwig IV

Following a detailed discussion of the Supreme Court and Ninth Circuit decisions

governing ineffective assistance of counsel claims in the context of plea offers and the duties

imposed on defense attorneys as a result, Mr. Ludwig IV notes that respondent failed to

acknowledge, address, or even cite Lockhart or Lafler v. Cooper, 566 U.S. 156 (2012).  (ECF No.

391 at 8.)  Moreover, respondent's only citation to Frye acknowledged only the "horse trading"

aspect of plea bargaining.  Respondent also omitted any discussion of the Ninth Circuit's

controlling case law applying Lockhart in United States v. Blaylock, 20 F.3d 1458, 1465 (9th Cir.

1994), or Turner v. Calderon, 281 F.3d 851, 880 (9th Cir. 2002), or a district court's application

of this case law in United States v. Wilson, 719 F. Supp. 2d 1260, 1269 (D. Or. 2010).  Finally,

all the cases respondent relied upon were decided in 2012, before the Supreme Court decided

Lafler and Frye, and did not apply Lockhart.  (ECF No. 391 at 9.)

Movant contends that such case law establishes that his "marching orders" to Mr. Cosca

"to plead and be sentenced as soon as possible still had to be the product of [Mr. Ludwig IV's]

informed consent," and Mr. Ludwig IV demonstrates that Mr. Cosca failed to provide sufficient

specific information to obtain Mr. Ludwig IV's informed consent.  (ECF No. 391 at 9.)  Movant

objects to respondent's characterization of, and failure to cite, specific facts from Mr. Cosca's

testimony.  Such failure included the key fact that Mr. Cosca did not confirm he informed Mr.

Ludwig IV "that if he continued the sentencing hearing until after November 1, 2015, it would

reduce the relevant sentencing range by 15 months."  (ECF No. 391 at 9.)  Rather, Mr. Cosca

testified that he told Mr. Ludwig IV to delay his plea, but Mr. Ludwig IV "adamantly" refused.

(ECF No. 378:38-39.)  Such failures demonstrate the representation was ineffective.

##### i.  Mr. Ludwig IV Was Not Given Necessary Info for Informed Decision

Movant argues that respondent overstates Mr. Cosca's testimony (ECF No. 390:9-10)

because Mr. Cosca's own testimony fails to provide sufficient facts to demonstrate Mr. Ludwig

1   IV made an informed decision as to the importance of the timing of his plea and sentencing.

2   (ECF No. 378:27-28.)  First, Mr. Cosca could not testify to the exact language he used to inform

3   Mr. Ludwig IV about Amendment 791 (ECF No. 378 at 28), yet respondent characterized Mr.

4   Cosca's testimony as informing Mr. Ludwig IV of the change and how it could affect his sentence

5   (ECF No. 390 at 9).

6          Second, Mr. Cosca could not testify as to what he knew about Amendment 791 at the

7   time, yet respondent characterized this as Mr. Cosca's awareness of Amendment 791, and that

8   Mr. Cosca informed Mr. Ludwig IV that it had the potential to lower his sentencing exposure by

9   two offense level points (ECF No. 390 at 9).  Respondent credited Mr. Cosca's testimony that he

10  was aware of Amendment 791, despite his inability to explain where his knowledge of the

11  pending change came from and could not corroborate such knowledge.  (ECF No. 391 at 12,

12  citing ECF Nos. 378:21-22, 22-21, & 26-27; 390 at 6.)  Mr. Cosca only testified how he generally

13  does legal research, which might include speaking with other attorneys, he admitted he did not

14  confer with CJA panel attorneys or the federal defender's office about how to time a plea or

15  sentence to take advantage of Amendment 791 (ECF No. 378 at 38).  Mr. Cosca's testimony that

16  he conducted legal research on the changes to the sentencing guidelines was vague, nonspecific

17  and uncorroborated by either billing entries or legal research.  (ECF No. 378 at 27.)  Rather, Mr.

18  Cosca's file contained six pages of handwritten notes, none of which referenced Amendment 791

19  or pending changes to the sentencing guidelines.  (ECF No. 378 at 13-14, 19, 22.)  Mr. Cosca's

20  inability to remember the basis for Amendment 791 and his testimony that he "probably knew"

21  the basis, is insufficient to demonstrate he fully informed Mr. Ludwig IV about Amendment 791,

22  including specific details as to the significance of the pending changes and the importance of plea

23  timing.   (ECF No. 391 at 13, citing ECF No. 378 at 68.)

24         Third, absent documentary corroboration, Mr. Cosca's testimony that on one occasion he

25  mentioned two points, and his vague answers such as "I don't remember now" but that I

26  "probably knew," are insufficient to discharge his duty to Mr. Ludwig IV, and does not support

27  respondent's characterization that Mr. Ludwig IV "heard and understood" Mr. Cosca's advice but

28  rejected it (ECF No. 390 at 5).

1    Fourth, Ms. Hilder recalled no specific numbers; she was unable to confirm that Mr.

2    Cosca mentioned the two-point difference or explain anything about it, including a sentencing

3    range reduction of 15 months.  Rather, the testified that Mr. Cosca told Mr. Ludwig IV he should

4    wait because "the new guideline could benefit him," and could only confirm that Mr. Cosca stated

5    that Mr. Ludwig IV might benefit if he waited.  (ECF No. 378 at 75-76; 78-79.)  Thus,

6    respondent's reliance on a "history of events" overstates the testimony of Mr. Cosca and Ms.

7    Hilder.  (ECF No. 390 at 9-10.)

8    General references to guidelines changes and two-point changes "fall far short of an

9    advisement necessary to produce an informed decision."  (ECF No. 391 at 14.)  Ms. Hilder was

10    biased and protective of Mr. Cosca based on their on-going relationship; she was Mr. Cosca's

11    investigator on several cases, and they discussed their testimony prior to the evidentiary hearing.

12    (Id.)

13    Further, movant contends that even taken with Ms. Hilder's testimony, Mr. Cosca's scant

14    testimony, including a single uncorroborated reference to a two-point change, does not show Mr.

15    Cosca explained to Mr. Ludwig IV the sentence he would receive if he waited until November 1,

16    2015, to enter a plea or be sentenced.  Mr. Cosca's testimony did not show what he knew about

17    Amendment 791, and the basis for his claim regarding what Mr. Ludwig IV actually knew; thus,

18    Mr. Cosca's testimony is insufficient under Blaylock.  (ECF No. 391 at 14.)

19    Movant refutes the significance of Mr. Ludwig IV's failure to ask Mr. Cosca in

20    correspondence about Amendment 791.  (ECF No. 390 at 9.)  If movant orally asked Mr. Cosca

21    about Amendment 791 and Mr. Cosca said there was nothing going on, there is no reason for Mr.

22    Ludwig IV to ask the same question in writing thereafter.  (ECF No. 378 at 170-71.)  In any

23    event, whether or not Mr. Ludwig IV had another source of information, it was believable for Mr.

24    Ludwig IV to take his legal advice from his lawyer rather than other inmates.  (ECF No. 391 at

25    15.)

26    Movant argues that the record demonstrates lowering his total sentence was more

27    important to Mr. Ludwig IV than serving a longer sentence at a location close to his daughter.

28    (ECF No. 391 at 15, citing ECF No. 378 at 144.)  As further evidence, Mr. Ludwig IV points to

1   Mr. Ludwig IV's willingness to be transported to the Sacramento County Jail for the evidentiary

2   hearing.  (ECF No. 391 at 15.)

3          Even if the court credits Mr. Cosca's claim that he mentioned a two-point change to Mr.

4   Ludwig IV on one occasion, Mr. Cosca did not testify that such change would be in Mr. Ludwig

5   IV's favor or would definitely receive a benefit if he waited.  Rather, Mr. Cosca's language was

6   couched in possibility, which was insufficient because Mr. Cosca had a legal duty to fully inform

7   Mr. Ludwig IV of how the plea timing could affect whether Amendment 791 would apply, and

8   that waiting for Amendment 791 to become effective potentially would enable him to obtain a

9   sentencing range 15 months less than the range set forth in the plea agreement.  (ECF No. 391 at

10  16.)  This assertion is supported by Mr. Balazs testimony that the failure to do so under such

11  circumstances would violate the standard of care.  (ECF No. 378 at 202-03.)

12         Movant argues that Mr. Cosca's own testimony as to what he advised Mr. Ludwig IV was

13  insufficient and rendered Mr. Cosca's representation ineffective under Blaylock, Turner and

14  Wilson.  (ECF No. 391 at 17.)

15              ii.  Failure to Include Plea Negotiations Into the Written Plea Agreement

16         Mr. Balazs testified that defense attorneys can document their performance of the standard

17  of care by including pre-plea negotiations in the plea agreement, by acknowledging impending

18  Amendment 791, and reserving the right to request the district court consider sentencing under

19  the proposed amendment through a variance.  (ECF No. 378 at 205, 215.)  Had pending

20  Amendment 791 been included, the plea agreement would have confirmed the parties were aware

21  and understood Amendment 791 was pending, even if the prosecution would not agree to apply

22  Amendment 791 before it became effective.  Despite respondent's reliance on Mr. Cosca's

23  testimony that the prosecutor declined to entertain guidelines that did not include a sentence of 84

24  months, there was no testimony demonstrating the parties reached any agreement about

25  Amendment 791 (ECF Nos. 378 at 30-33; 390 at 19), and the court should not consider such

26  testimony under the parol evidence rule.  (ECF No. 391 at 18, citing ECF No. 130 at 10.)  The

27  ////

28  ////

1    Supreme Court has explained the value of documenting such pre-plea negotiations.  Frye, 566

2    U.S. at 146.[8]

3              b.  Failure to Seek a Continuance

4         In his initial briefing, movant argues that Mr. Cosca should have requested a continuance

5    of the sentencing so that Mr. Ludwig IV could benefit from Amendment 791.  (ECF Nos. 206 at

6    11, 23; 248 at 2.)  It is undisputed that Mr. Cosca did not request such a continuance.  There is no

7    evidence that Mr. Cosca discussed this option with Mr. Ludwig IV so he could make an informed

8    decision to forego a continuance.  Mr. Cosca admitted that the plea agreement did not prevent

9    him from asking for such a continuance, and he did not investigate whether this was a viable

10   option and whether Judge Mueller had previously granted such continuances given the impending

11   guidelines changes.  (ECF No. 378 at 47, 38.)

12        However, Mr. Cosca agreed that if the sentencing had been continued to November 1,

13   2015, the duty of care required him to argue for the new sentencing guidelines range.  When

14   asked whether that would still apply if the plea agreement set forth a guidelines range under the

15   old guidelines, Mr. Cosca did not know the answer.  (ECF No. 378 at 134-35.)  Such admission

16   suggests Mr. Cosca had not considered what impact such a continuance would have had, and was

17   not a course of action he had considered or discussed with Mr. Ludwig IV prior to seeking to

18   advance the hearing.  Thus, there is no evidence Mr. Cosca informed Mr. Ludwig IV of the option

19   or impact of continuing such hearing.

20        Movant counters that Morgan, 376 F.3d at 1002, does not support respondent's argument

21   in this context.  Moreover, in Morgan, the Court set forth relevant factors to consider whether an

22   amendment is clarifying or substantive, including "(1) whether the amendment is included on the

23

---

24   [8]  "First, the fact of a formal offer means that its terms and its processing can be documented so
     that what took place in the negotiation process becomes more clear if some later inquiry turns on
25   the conduct of earlier pretrial negotiations.  Second, States may elect to follow rules that all offers
     must be in writing, again to ensure against later misunderstandings or fabricated charges.  See N.
26   J. Ct. Rule 3:9-1(b) (2012) ("Any plea offer to be made by the prosecutor shall be in writing and
     forwarded to the defendant's attorney").  Third, formal offers can be made part of the record at
27   any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has
     been fully advised before those further proceedings commence."  Frye, 566 U.S. at 146.
28

1   list of retroactive amendments found in U.S.S.G. § 1B1.10(c); (2) whether the [USSC] itself

2   characterized the amendment as a clarification; and (3) whether the amendment resolves a circuit

3   conflict."  Id. at 1010-11.  Because Amendment 791 is substantive and cannot be applied

4   retroactively, the timing of Mr. Ludwig IV's plea and sentence was critical.  (ECF No. 391 at 6.)

5           Movant disputes respondent's characterization of any request to continue the sentencing

6   hearing as pretext, because Mr. Ludwig IV has never suggested Mr. Cosca seek a continuance on

7   unethical or pretextual grounds.  Rather, Mr. Ludwig IV "fully disclosed the basis on which the

8   continuance should have been requested as the inflationary adjustment provided for in

9   Amendment 791, and Mr. Balazs opined that Judge Mueller would likely have granted a

10  continuance on that ground."  (ECF No. 391 at 21, citing 385 at 49; see also 210-11.)  Further,

11  Mr. Balazs testified that defense counsel can have more than one equally valid basis for seeking a

12  continuance without violating an attorney's duty of candor, so long as the reason is factually and

13  legally valid.  (ECF No. 385 at 235-36.)  Moreover, whether or not to grant such a continuance is

14  committed to the sound discretion of the court.  United States v. Turner, 897 F.3d 1084, 1102 (9th

15  Cir. 2018).  Had Judge Mueller granted the request, as was likely, and continued sentencing until

16  on or after November 1, 2015, Judge Mueller would have applied the new guidelines.  (ECF No.

17  378 at 33-34.)  The probative evidence that Judge Mueller would have granted the request and

18  applied the new guidelines is that none of Mr. Ludwig IV's co-defendants entered a plea before

19  2016, and defendants Harned and Mullin, who were affected by the tax table changes in

20  Amendment 791, entered pleas and were sentenced under the amended guidelines.  Such evidence

21  demonstrates no defendant was under any time pressure to enter a plea.  (ECF No. 391 at 23.)

22          Further, even if Mr. Ludwig IV had changed his mind and wanted Mr. Cosca to continue

23  the sentencing, Mr. Cosca testified that he "would have to think about it."  (ECF No. 378 at 47.)

24  Mr. Ludwig IV suggests this could explain why Mr. Cosca failed to inform Mr. Ludwig IV about

25  this option:  Mr. Cosca was convinced Mr. Ludwig IV's desire to be sentenced as soon as

26  possible was absolute.  (ECF No. 391 at 22-23.)

27          Additionally, Mr. Ludwig IV disputes respondent's position that after he entered his plea,

28  seeking to continue the sentencing would have risked the prosecutor seeking a sophisticated

1    means enhancement and that Judge Mueller "may well have applied it." (ECF No 391 at 23,

2    quoting ECF No. 390 at 22.)  Such argument is specious ("a red herring" as previously argued),

3    and respondent's position is based on mere speculation.  Seeking a continuance would not violate

4    the plea agreement because the agreement left the determination of the guidelines range up to the

5    court and was silent as to Amendment 791.  Mr. Cosca did not testify that he did not seek a

6    continuance of the sentencing because of the potential sophisticated means enhancement; rather,

7    his decision was based on Mr. Ludwig IV's desire to be sentenced as soon as possible.  (ECF No.

8    378 at 55, 134.)  But absent a showing that Mr. Ludwig IV's decision was fully informed, as

9    previously discussed, such decision was not valid, and Mr. Cosca was ineffective based on his

10   failure to seek a continuance of the sentencing until after November 1, 2015.

11            c.  Failure to Argue Lower End Sentence Based on Amendment 791 Rationale

12            Mr. Cosca testified that he knew about the impending guidelines changes and admitted

13   that the plea agreement did not preclude him arguing for the lower end based on such changes.

14   (ECF No. 378 at 32-33, 52-53.)  Instead, Mr. Cosca testified he argued for the lower end on other

15   grounds based on the tactical reason that "the agreement was the government would not ask for

16   the sophisticated means enhancement," and if he argued for low term based on the adjustment to

17   the tax table, the prosecutor "could respond with the aggravating facts and at a minimum get the

18   84 [months] and possibly more, depending on how Judge Mueller viewed the facts."  (ECF No.

19   378 at 53, 132.)

20            Movant contends that Mr. Cosca's position "makes no sense," because the plea agreement

21   did not limit the basis on which Mr. Cosca could argue for the low term.  (ECF No. 391 at 25,

22   citing ECF No. 130 at 5.)  If there was an oral agreement between Mr. Cosca and the prosecutor it

23   should have been included in the written plea agreement.  Mr. Ludwig IV contends that Mr.

24   Cosca did not make the argument because he was not aware of the rationale for Amendment 791.

25   Mr. Cosca testified that he "didn't know if he knew, but that he "probably knew."  (ECF No. 378

26   at 67-68.)  Mr. Cosca's failure to make the argument is evidence that he did not know the basis

27   for Amendment 791.  In Mr. Balazs' opinion, the failure to make such argument violated the

28   standard of care.  (ECF No. 378 at 211-12.)  Mr. Cosca's testimony that he had no such duty

(ECF No. 378 at 130-31) is unpersuasive because Mr. Cosca would breach the agreement only if he sought "a different sentence than what is called for under the advisory range as determined by the Court." (ECF No. 130 at 9; 385 at 58-59.)

       d. Failure to Ask Court to Apply Amendment 791 Before Enacted

       Mr. Balazs testified that, in the Eastern District of California, it was common practice for defense attorneys "to argue for the district court to apply the new sentencing range before it was effective." (ECF No. 391 at 26, citing ECF No. 378 at 207.) "Because inflation had caused the tax tables to overstate the amount of loss, and therefore to overstate the appropriate sentencing range, Mr. Balazs opined that Mr. Cosca would have been permitted to argue that this was an appropriate factor on which to argue the range and the new sentencing range should be applied or the sentencing continued until after the effective date under 18 U.S.C. § 3553(a)(2)(A). (ECF No. 391 at 26, citing ECF No. 378 at 207.)

       e. The Sophisticated Means Enhancement Risk is a Red Herring

       Movant argues that Mr. Cosca's preoccupation with the putative risk of the sophisticated means enhancement is a red herring for several reasons.

       First, if Mr. Cosca had argued that the inflationary adjustment provided for in Amendment 791 justified sentencing Mr. Ludwig IV to the low end of the current guidelines, it is unlikely the prosecutor would have responded by arguing a sophisticated means adjustment. If the prosecutor intended to pursue such an enhancement, her objections to the PSR's application of the guidelines were due 14 days after the initial PSR was disclosed. Fed. R. Crim. P. 32(f)(1). At sentencing, nothing in the proposed argument concerning inflationary adjustment to the tax tables would have triggered a late effort to seek a "sophisticated means" adjustment by the prosecutor.

       Second, Mr. Ludwig IV did not agree that the sophisticated means enhancement applied to him. Whether or not Mr. Ludwig IV was correct in his assessment, it was Mr. Ludwig IV's decision whether or not to assume such a risk. Because Mr. Ludwig IV did not consider this to be a valid risk, it was not a reason for Mr. Ludwig IV to oppose continuing the sentencing hearing, arguing to apply Amendment 791 before November 1, 2015, or arguing for the low end of the current guidelines based on the inflation adjustment. (ECF No. 390 at 27.) Had Mr. Cosca

1    informed Mr. Ludwig IV of these options, and the benefit to be gained by such arguments,

2    specifically a sentencing range lower by 15 months, Mr. Ludwig IV would have had a more

3    compelling reason to wait.

4             Third, even assuming the factual basis in the plea agreement supported a sophisticated

5    means enhancement, and Mr. Ludwig IV was sentenced after November 1, 2015, and the

6    enhancement was imposed, the additional two points for the enhancement would have been offset

7    by the loss of two points based on the new tax tables.  Thus, it would at worst be a zero sum gain,

8    but at best, his sentence would have been at least 15 months lower.  Such analysis renders Mr.

9    Cosca's advice that Mr. Ludwig IV could end up worse off was incorrect and ineffective

10   assistance.

11            Fourth, after November 1, 2015, the imposition of the sophisticated means enhancement

12   was even less likely with the enactment of Amendment 792, which narrowed the focus of such

13   enhancement.  (ECF No. 391 at 28, citing U.S.S.G. supp. App'x C amend. 792 at 113 (Nov. 1,

14   2015).)  Mr. Cosca testified he was not aware of Amendment 792, or that there were pending

15   changes to the sophisticated means enhancement.  (ECF No. 378 at 39.)  Mr. Ludwig IV contends

16   Mr. Cosca's advice was not current or well-informed, but was vague, incomplete, and inaccurate,

17   rendering it ineffective assistance.

18            For all of the above reasons, the purported risk of the sophisticated means enhancement

19   was not a strategic or tactical reason not to seek a continuance of the sentencing hearing.

20            f.  Mr. Cosca Demonstrated Bias Against Mr. Ludwig IV

21            Movant urges the court to consider several factors bearing on Mr. Cosca's credibility.

22            First, Mr. Cosca's claim that he researched changes to the sentencing guidelines is not

23   credible because he could not explain the source of his knowledge; he was not familiar for the

24   basis of Amendment 791, and there was no note in Mr. Cosca's file calculating Mr. Ludwig IV's

25   exposure under Amendment 791, despite Mr. Cosca's agreement this was important and had

26   documented his calculations under the existing guidelines.  (ECF No. 378 at 21-22, 63.)  Mr.

27   Cosca did not "follow best practices in the maintenance of his files."  (ECF No. 391 at 30.)

28   ////

1    Second, if Mr. Ludwig IV knew that by waiting until November 1, 2015, his sentencing

2    range would be 15 months shorter, it would make no sense for him to insist on being sentenced

3    earlier to be closer to his daughter, but incarcerated for 15 months longer.  Mr. Ludwig IV

4    testified that he would not have made such a choice.  (ECF No. 378 at 146.)

5    Third, if Mr. Cosca was aware of Amendment 791, and the plea agreement allowed Mr.

6    Cosca to argue for the low term, it is unclear why Mr. Cosca would not argue that the court apply

7    Amendment 791 or consider its underlying basis at sentencing.

8    Fourth, Mr. Ludwig IV points out that Mr. Cosca factored in the multiple victim

9    enhancement in advising Mr. Ludwig IV of his maximum exposure (ECF No. 378 at 15), despite

10   the fact that in tax fraud cases the guidelines make clear there can be only one victim, the U.S.

11   Treasury.  United States v. Fleming, 128 F.3d 285, 288 (6th Cir. 1997).  "Mr. Cosca was not

12   conversant with the relevant law, and was not keeping up with relevant developments."  (ECF

13   No. 391 at 31.)

14   Finally, "Mr. Cosca showed great antipathy toward [Mr. Ludwig IV]."  (ECF No. 391 at

15   31, citing ECF No. 378 at 44-45."  "[Mr. Ludwig IV] was the most needy client I have ever had,

16   the most demanding," and viewed the filing of this § 2255 motion as an attack on his

17   integrity.  (ECF No. 378 at 45.)

18   g.  Mr. Ludwig IV Demonstrated Strickland Prejudice

19   Movant argues he has demonstrated a reasonable probability that but for Mr. Cosca's

20   errors, the outcome would have been different for the following reasons.

21   1. If Mr. Cosca had delayed negotiating a plea agreement until November 1, 2015,

22   Amendment 791 would have taken affect, and the guidelines range would have lowered by 15

23   months.

24   2. If Mr. Cosca had made a motion to continue the sentencing, after he entered his plea, it

25   is reasonably likely Judge Mueller would have granted it.

26   3. If, after Mr. Ludwig IV entered his plea, Mr. Cosca had argued at sentencing that the

27   inflation overstatement contained in the existing tax table, as recognized in Amendment 791,

28   ////

1    supported the imposition of the lower term, it is reasonably probable Judge Mueller would have

2    imposed the lower term.

3         4.  If Mr. Cosca had argued that 18 U.S.C. § 3553(a)(2)(A) allowed the court to consider

4    the need for the sentence to reflect "the seriousness of the offense" and "to provide just

5    punishment for the offense," it is reasonably probable that Judge Mueller would have applied the

6    new guideline before November 1, 2015, recognizing that the current tax tables overstated the

7    seriousness of the offense, and failed to provide just punishment for the offense.[9]

8         III.  Sentencing Guidelines Amendments Pending in 2015

9         On January 16, 2015, the United States Sentencing Commission ("USSC")[10] published a

10   set of proposed Sentencing Guidelines changes for public comment, including an amendment to

11   the Tax Table under Section 2R4.1.  See USSC, Proposed Amendments to the Sentencing

12   Guidelines, issued Jan. 16, 2015, at 44.  The pertinent part of the proposed change lowered from

13   20 to 18 the base offense level for a crime resulting in a tax loss of $400,000.00.  Id. at 44-45.

14   Such changes to the tax table were identified as "Amendment 791."

15        On April 30, 2015, the public comment period closed, and the proposed amendments were

16   submitted by the USSC to Congress for review, with a specified effective date of November 1,

17   2015.  Sentencing Guidelines for United States Courts, 80 FR 25782-01, 2015 WL 1968941; See

18   USSC, United States Sentencing Commission Guidelines Manual:  Supplement to Appendix C,

19   November 1, 2015, at 102.  On November 1, 2015, Congress adopted the proposed amendments,

20   including Amendment 791.

21   IV.  Legal Standards Applicable to Ineffective Assistance of Counsel Claims

22        A.  Strickland Generally

23        The Sixth Amendment of the United States Constitution as applied to the states through

24   the Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of

---

[9]  Reasons two through four are supported through the testimony of expert testimony of Mr. Balazs.  (ECF No. 391 at 32.)

[10]  The USSC publishes changes to the Sentencing Guidelines on their website, http://www.ussc.gov/guidelines/amendments.

1    counsel at trial.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To warrant habeas relief

2    due to ineffective assistance of counsel, a movant must demonstrate that:  (1) counsel's

3    performance was deficient; and (2) the deficient performance prejudiced his defense.  Id., 466

4    U.S. at 687-93; see also Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (Sixth

5    Amendment right is denied when a defense attorney's performance falls below an objective

6    standard of reasonableness and thereby prejudices the defense) (citations omitted).  Both prongs

7    of the Strickland test must be satisfied to establish a constitutional violation; failure to satisfy

8    either prong requires that a movant's ineffective assistance of counsel claim be denied.

9    Strickland, 466 U.S. at 687, 697 (no need to address deficiency of performance if lack of

10   prejudice is obvious); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) (failure to satisfy either

11   prong of Strickland test obviates need to consider the other).

12       The first prong of the Strickland test, deficient performance, requires a showing that

13   counsel's performance fell "outside the wide range of professionally competent assistance."

14   Strickland, 466 U.S. at 690.  Reviewing courts must "indulge a strong presumption that counsel's

15   conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  This

16   presumption of reasonableness means that the court must "give the attorneys the benefit of the

17   doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

18   may have had for proceeding as they did."  Cullen v. Pinholster, 563 U.S. 170, 196 (2011)

19   (internal quotation marks and alterations omitted).  A reviewing court is required to make every

20   effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

21   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

22   time."  Strickland, 466 U.S. at 669.  Movant bears the heavy burden of demonstrating that

23   counsel's assistance was not reasonable or the result of sound strategy.  Murtishaw v. Woodford,

24   255 F.3d 926, 939 (9th Cir. 2001); see also Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.

25   2007) (en banc) ("Because this case involves a claim of ineffective assistance of counsel, there is

26   an additional layer of deference to the choices of trial counsel").

27       The second prong of the Strickland test, prejudice, requires a showing of a "reasonable

28   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

1  been different."  Strickland, 466 U.S. at 694-95.  A reasonable probability is a probability

2  "sufficient to undermine confidence in the outcome."  Id.

3        B.  Strickland in the Guilty Plea Context

4        The Strickland standard applies in the plea context.  Hill v. Lockhart, 474 U.S. 52, 58

5  (1985).  Due process requires that a guilty plea be knowing, intelligent, and voluntary.  Boykin v.

6  Alabama, 395 U.S. 238, 242-43 (1969); see also Little v. Crawford, 449 F.3d 1075, 1080 (9th Cir.

7  2006).  In determining the validity of a guilty plea, courts look to "whether the plea represents a

8  voluntary and intelligent choice among the alternative courses of action open to the defendant."

9  Hill, 474 U.S. at 56 (citation & quotation marks omitted).  A guilty plea based on an attorney's

10  advice may be involuntary if the attorney rendered ineffective assistance.  Id. at 56-57.

11        The Strickland "prejudice" requirement "focuses on whether counsel's constitutionally

12  ineffective performance affected the outcome of the plea process."  Id. at 59.  "In other words, in

13  order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable

14  probability that, but for counsel's errors, he would not have pleaded guilty and would have

15  insisted on going to trial."  Id.; see also Washington v. Lampert, 422 F.3d 864, 873 (9th Cir.

16  2005).  The guilty plea prejudice inquiry closely tracks the inquiry involved in reviewing such

17  challenges to convictions obtained following trial.  Hill, 474 U.S. at 59.  Such "predictions of the

18  outcome at a possible trial, where necessary, should be made objectively, without regard for the

19  "idiosyncrasies of the particular decisionmaker."  Hill, 474 U.S. at 59-60.

20        Also, the United States Supreme Court has confirmed that the Sixth Amendment right to

21  counsel "extends to the plea-bargaining process."  Lafler v. Cooper, 132 S. Ct. 1376, 1384

22  (2012).  To prevail on such a claim, a movant must demonstrate "'gross error on the part of

23  counsel,'" Turner v. Calderon, 281 F.3d 851, 880 (9th Cir. 2002) (quoting McMann v.

24  Richardson, 397 U.S. 759, 772 (1970)), and that the advice he received from his counsel was "so

25  incorrect and so insufficient that it undermined his ability to make an intelligent decision about

26  whether to accept the [plea] offer.'"  Id. (quoting United States v. Day, 969 F.2d 39, 43 (3rd Cir.

27  1992) (noting "that familiarity with the structure and basic content of the Guidelines . . . has

28  become a necessity for counsel who seek to give effective representation")).)  The relevant

1  question is not whether "counsel's advice [was] right or wrong, but . . . whether that advice was

2  within the range of competence demanded of attorneys in criminal cases." McMann, 397 U.S. at

3  771 (holding that all defendants facing felony charges are entitled to the effective assistance of

4  competent counsel).

5        Defense counsel is not "required to accurately predict what the jury or court might find."

6  Turner, 281 F.3d at 881. See also McMann, 397 U.S. at 771 ("uncertainty is inherent in

7  predicting court decisions."); United States v. Martini, 31 F.3d 781, 782 n.1 (9th Cir. 1994)

8  ("Trials are difficult to predict, and advising a criminal defendant whether to accept or reject a

9  plea offer can be a tricky proposition."). Defense counsel is also not required to "discuss in detail

10  the significance of a plea agreement," give an "accurate prediction of the outcome of [the] case,"

11  or "strongly recommend" the acceptance or rejection of a plea offer. Turner, 281 F.3d at 881.

12  Although counsel must fully advise the defendant of his options, he is not "constitutionally

13  defective because he lacked a crystal ball." Id.

14        To show prejudice in the context of plea offers, "a defendant must show the outcome of

15  the plea process would have been different with competent advice." Lafler, 132 S. Ct. at 1384.

16  Under Glover v. United States, 531 U.S. 198, 203 (2001), any additional time served as a result of

17  deficient performance by counsel is prejudicial. However, Glover will govern only "if [movant's]

18  trial counsel's performance [was] deficient." United States v. Brim, 148 F. App'x 619, 620 (9th

19  Cir. 2005) (unpublished). "Glover . . . does not stand for the proposition that presence of jail time

20  establishes prejudice. The fundamental question is still governed by Lockhart which states that

21  "[t]he determinative question -- whether there is 'a reasonable probability that, but for counsel's

22  unprofessional errors, the result of the proceeding would have been different' -- remains

23  unchanged.'" United States v. Banuelos, 2013 WL 1249582, at *4 (D. Nev. Mar. 25, 2013),

24  quoting Lockhart, 474 U.S. at 57.

25  ////

26  ////

27  ////

28  ////

40

1    V.  Analysis

2         A.  Pre-Sentencing Claims

3              1.  Pre-Plea Negotiations

4         Mr. Ludwig IV testified that Mr. Cosca never mentioned the impending sentencing

5    changes to him, and that the testimony of both Mr. Cosca and Ms. Hilder was false.  (ECF No.

6    378 at 150, 157, 160, 162.)  If defense counsel had told Mr. Ludwig IV that proposed changes

7    were pending before the USSC, or properly informed him of the benefits of waiting, Mr. Ludwig

8    IV declares he would not have pled guilty to a plea agreement that did not give him the benefit of

9    an 18 base offense level, but would have insisted that counsel try to use the proposed changes to

10   negotiate a better plea deal, or to delay the plea and sentencing until after November 1, 2015.

11        Mr. Cosca testified that he discussed the proposed guidelines changes with Mr. Ludwig

12   IV.  "I urged him to delay so we could potentially take advantage [of the pending guidelines].

13   (ECF No. 378 at 175.)  Although Mr. Ludwig IV now disputes the details of such advice, that

14   defense counsel discussed the pending changes with Mr. Ludwig IV is supported by the testimony

15   of defense counsel's investigator.  (ECF No. 378 at 73-74.)  While Ms. Hilder could not recall the

16   specific changes discussed, she recalled that Mr. Cosca advised Mr. Ludwig IV that "[i]t would

17   benefit him to wait."  (Id. at 74.)  Specifically, Ms. Hilder testified that Mr. Ludwig IV was

18   "anxious to get out," "tired of waiting," "wanted to do his time and get out to see his daughter,"

19   and "was comfortable with the term of sentencing that was being suggested."  (Id. at 75.)  Ms.

20   Hilder recalled that Mr. Cosca then "recommend[ed] that Mr. Ludwig IV wait because this new

21   guideline could benefit him."  (Id. at 76.)  Ms. Hilder denied that Mr. Ludwig IV ever asked Mr.

22   Cosca to do any research.  (Id.)

23        Despite Mr. Ludwig IV's contention that Ms. Hilder may be biased based upon her

24   working relationship with Mr. Cosca, the undersigned found Ms. Hilder to be a credible witness.

25   Indeed, the court asked Ms. Hilder how she could recall Mr. Cosca and Mr. Ludwig IV having

26   that discussion, and she responded:

27            What sticks in my mind was Mr. Ludwig was very anxious to get out
             and start his time and do his time.  He was very concerned about
28           seeing his daughter, and he was really tired of waiting.

41

1
2
3
4

> And that conversation with him, when are we going to get this done, happened on more than one occasion. I would say probably at least two -- the last two that I visited with him. And that's what sticks out in my mind.
>
> And I remember Chris talking to him about the guidelines and him just wanting to proceed to get out. And he was tired of waiting.

5   (ECF No. 378 at 78.)

6        It is true that over three years and five months after Mr. Ludwig IV was sentenced, Mr.

7   Cosca could not recall the specifics of how he found out about Amendment 791 or the exact

8   words he used to explain the impact of Amendment 791 to Mr. Ludwig IV.  But Mr. Ludwig IV's

9   bald claim that defense counsel did not mention the pending changes at all is belied by the

10  testimony of Mr. Cosca and Ms. Hilder.  Mr. Ludwig IV faults Mr. Cosca for failing to take better

11  notes, failing to better explain the peril of not waiting for Amendment 791, and failing to

12  document that Mr. Ludwig IV was foregoing the benefit of Amendment 791 by refusing to wait.

13  But during these pre-plea meetings and negotiations no one knew when Amendment 791 would

14  become effective.  The proposed changes were not published by the USSC until January 16,

15  2015.  Because at the time the parties were negotiating the plea it was unclear when Amendment

16  791 would be adopted, it was not unreasonable for defense counsel to acquiesce to Mr. Ludwig

17  IV's decision not to wait or to attempt to negotiate a definite sentence recommendation.  Indeed,

18  it was not until April 30, 2015, that the public comment period closed, and the USSC adopted the

19  amendment and announced the effective date.  By then, Mr. Ludwig IV had already entered his

20  change of plea.  In addition, had Mr. Cosca waited to begin negotiating a plea until after

21  Amendment 791 became effective, Mr. Ludwig IV would have remained away from his daughter

22  far longer, something he did not want.

23        Moreover, Mr. Ludwig IV's decision at the change of plea hearing supports this court's

24  finding that he did not want further delay.  When movant hesitated about changing his plea and

25  discussed revisiting the loss amount with the prosecution, Mr. Ludwig IV decided to proceed with

26  the plea after Mr. Cosca advised that re-negotiating the facts could delay the plea.

27        The undersigned does not find that movant's declaration or testimony at the evidentiary

28  hearing was credible.  The weight of the evidence, including Mr. Ludwig IV's own letters,

1    confirms that Mr. Ludwig IV was "tired of waiting," and wanted to plead guilty and be sentenced

2    so that he could begin his federal sentence and return to federal prison in Oklahoma where he

3    could see his daughter.  For over a year Mr. Ludwig IV insisted he wanted to resolve his case

4    quickly, and wanted to get back to Oklahoma to be near his daughter.  (ECF No. 378 at 28, 47,

5    60, 75, 78-79, 91, 95, and 116 (Mr. Cosca's testimony); ECF No. 378 at 165, 172 (Mr. Ludwig

6    IV's testimony).  In his April 30, 2014 letter, Mr. Ludwig IV wrote that he was unable to call his

7    daughter from jail because of the time difference; in one month, he had only spoken with her

8    twice.  (Ex. A.)  In his September 3, 2014 letter, Mr. Ludwig IV wrote:  "Mr. Cosca, I want to

9    plead guilty and get sentenced.  We can't take this to trial and win anything that will make a

10   difference.  My daughter needs her daddy close by.")  (Ex. 2.)  Although in a different context,

11   Mr. Ludwig IV also commented that he did some "figuring for the fraudulent returns . . . so the 2

12   points was not that big of a deal."  (Ex. 2.)  In his February 25, 2015 letter, Mr. Ludwig IV wrote:

13   "I have said since May of last year that I would sign for 84 months."  (Ex. 5.)  In his March 12,

14   2015 letter, he wrote:  "I am hoping to get this deal done ASAP.  I got another letter from my

15   daughter today.  They mess me up when I get them.  Every one of them ends with 'I hope I can

16   see you soon.  I just don't know how to explain to her why I'm not at a place that she can see

17   me."  (Ex. 6.)  In the same letter he added, "Please keep on the AUSA for this deal."  (Ex. 6.)  On

18   February 4, 2015, in a letter to "Kurt," Mr. Ludwig IV wrote, "I'll take 84 months right now.  I'll

19   be out in 63."  (Ex. 8 at 2.)[11]  With benefit of hindsight, Mr. Ludwig IV now claims that Mr.

20   Cosca failed to mention the pending guidelines changes at all, and that had Mr. Cosca

21   appropriately informed Mr. Ludwig IV of all the options and ramifications, Mr. Ludwig IV would

22   have waited, or, would have instructed Mr. Cosca to use every means possible to delay Mr.

23   Ludwig IV's sentencing until after Amendment 791 became effective.  But this court is not

24   persuaded.

25   _____

26   [11]  Respondent also cited Ex. H to support the claim that movant wanted to plead and be
      sentenced quickly to get back to see his daughter.  But in movant's July 31, 2014 letter, Mr.

27   Ludwig IV expressed his desire to get out of prison before his daughter was an adult, and
      suggested that if he was sentenced to 60-77 months he had a chance to get out of prison while she

28   was in her late teens.  (Ex. H.)

1    Rather, Mr. Ludwig IV diminishes his own role in the process, his rush to obtain a plea

2    offer, to enter into a plea agreement, and advance the sentencing, all so he could begin his federal

3    sentence and return to Oklahoma.  Now with benefit of hindsight, Mr. Ludwig IV attempts to

4    rewrite how Mr. Cosca's representation was carried out, minimizing his post-sentencing letter to

5    counsel:  "thank you for working miracles," which Mr. Ludwig IV explained referenced Mr.

6    Cosca getting the sentencing date put back to the original date of July 8.  (ECF No. 378 at 176,

7    citing Ex. GG.)  As well as the July 12, 2015, letter stating:  "thank you for doing all you could

8    do.  I got what I asked for.  I am going back to Oklahoma Prison."  (Ex. II.)  The fact that Mr.

9    Ludwig IV insisted on not waiting is also supported by Mr. Cosca's argument at sentencing:  Mr.

10   Ludwig IV was "the driving force in requesting a plea agreement early on. . .  He wanted to get

11   this behind him, he wanted to accept responsibility, take his medicine and move on."  (ECF No.

12   148 at 11.)

13   None of movant's letters to 'Mr. Cosca reference Amendment 791 or proposed guidelines

14   changes.  Of course, that could be viewed as movant was unaware.  But movant testified he began

15   hearing rumors about guidelines changes in December of 2014 or January of 2015, claimed he did

16   not know the "meat" of the rumors, yet testified he "just heard it was a two-point reduction like

17   they gave the drug offenders," and did not know it was tied to loss amounts.  (ECF No. 378 at

18   166-67.)  Movant explained that he did not write to Mr. Cosca about such rumors because movant

19   had asked Mr. Cosca on three separate occasions, but Mr. Cosca told him "nothing was

20   happening, and if it did, I would get it," and, Mr. Cosca never responded to movant's letters, so

21   movant only asked Mr. Cosca these things in person, and only wrote to Mr. Cosca about things

22   movant could make notes on and look at case law and current sentencing guidelines.  (ECF No.

23   169, 170.)  But the undersigned finds movant's explanation not credible in light of his own

24   correspondence demonstrating his involvement in his own defense.  As argued by respondent,

25   Mr. Ludwig IV wrote Mr. Cosca about issues they had discussed, such as sentencing exposure,

26   guidelines calculations, enhancements for leadership role, loss amounts, sophisticated means, and

27   the progress of plea negotiations with the prosecutor.  (Exs. C, D, G, H, 2 K, S-002, 5 & EE.)  On

28   two occasions, movant provided Mr. Cosca lists of items for Mr. Cosca to collect, research or

44

1    investigate.  (Ex. E-002-004; Ex. Q-002.)  Mr. Ludwig IV's correspondence demonstrated that he

2    was astute and knowledgeable about the sentencing process.  (See, e.g., Ex. E, G, H.)  For

3    example, he asked why Mr. Cosca was sending Mr. Ludwig IV redacted documents, and claimed

4    it was hindering his ability to defend his case.  (Ex. E-1.)  In another letter, he explained he

5    understood that Mr. Cosca could not just ask the prosecutor to agree to five or seven years, and

6    then set forth a detailed suggestion of what Mr. Cosca could offer.  (Ex. H.)  The undersigned

7    finds it more likely that had Mr. Ludwig IV heard rumors about a two point change, and Mr.

8    Cosca explained that it was unclear when the guidelines changes would occur, Mr. Ludwig IV

9    opted to have counsel obtain a timely plea offer from the prosecution, which is what Mr. Cosca

10   did.

11       Movant condemns Mr. Cosca's advice because it was cloaked in possibility, claiming Mr.

12   Ludwig IV "might" benefit, when Amendment 791 would have provided Mr. Ludwig IV with a

13   lower base offense level.  But, as argued by respondent, in pre-plea negotiations, Mr. Ludwig IV

14   presumes all other factors would remain equal, that the prosecutor would have lowered her view

15   of the appropriate sentence, that no other enhancements would come into play, and that the judge

16   would exercise her discretion and simply apply the mid-range of the revised tax tables.  See

17   United States v. Booker, 543 U.S. 220, 245-46 (2005) (district courts must consider the

18   Sentencing Guidelines but have discretion to vary or depart from such guidelines).  Given such

19   variables, the undersigned finds defense counsel's characterization of the benefit as a possibility

20   was not unreasonable during such pre-plea negotiations.

21       In fact, Mr. Ludwig IV overstates the benefit he would have received under Amendment

22   791.  Mr. Ludwig IV's focus is a 15-month reduction in the sentencing range had Mr. Ludwig IV

23   waited.  But Mr. Cosca testified that the prosecutor was adamant she was not willing to offer less

24   than 84 months.  (ECF No. 378 at 32.)  In her February 17, 2015 email, the prosecution noted that

25   Mr. Ludwig IV "appears to think that 84 months is an appropriate sentence . . . He 'do[esn't] see

26   less than' that. . . . I tend to agree."  (ECF No. 378 at 32; Ex. V.)  It is unclear what the

27   government's plea offer would have looked like after November 1, 2015.  As discussed in more

28   detail below, it is also unclear what the sentencing judge would have done.

1    Again, the weight of the evidence demonstrates Mr. Ludwig IV's urgency to obtain a plea

2    bargain, get sentenced, and return to Oklahoma.  His concern for his dad or his few comments

3    posturing that he wanted to go to trial are insufficient to demonstrate he would have been willing

4    to delay or actually go to trial, particularly given the multiple counts that were dismissed which

5    would risk a much higher sentence had he opted to go to trial (ECF No. 130 at 6-7).  While Mr.

6    Ludwig IV now contends he would have changed his position had he been properly informed, the

7    undersigned does not believe him.  It was Mr. Ludwig IV's strong position at the time, not his

8    changed position made in hindsight, that supports this court's view that Mr. Cosca's performance

9    during pre-plea negotiations was not deficient.  Given the fact that it was unclear when

10   Amendment 791 would become effective, it was not unreasonable for Mr. Cosca to proceed to

11   negotiate a plea offer and was certainly in line with Mr. Ludwig IV's instructions at the time.

12   For all of the above reasons, the undersigned believes Mr. Cosca discussed the pending

13   guidelines changes with Mr. Ludwig IV, but that Mr. Ludwig IV did not want to wait until they

14   became effective.  After all, the effective date of Amendment 791 was not known at the time he

15   entered his plea.  Mr. Cosca negotiated a sentence of 84-months which was favorable to Mr.

16   Ludwig IV in light of the overwhelming evidence against him, and the additional counts and

17   longer sentence he faced if he opted to go to trial.  The record reflects Mr. Ludwig IV was willing

18   to accept an 84-month sentence, and he changed his plea in open court pursuant to the plea

19   agreement he signed.  Finally, Amendment 791 did not become effective until November 1, 2015,

20   over six months after movant changed his plea.  Given the highly deferential scrutiny required

21   under Strickland, the court cannot find that Mr. Cosca failed to properly advise Mr. Ludwig IV,

22   or that Mr. Cosca's decisions were outside the wide range of reasonable professional assistance,

23   particularly where the record demonstrates Mr. Ludwig IV's urgent desire to plead guilty and be

24   sentenced quickly.  Strickland, 466 U.S. at 689; see also Padilla v. Kentucky, 559 U.S. 356, 371

25   (2010) ("Surmounting Strickland's high bar is never an easy task.").

26   2. Failure to Seek Continuance of Sentencing

27   Similarly, Mr. Ludwig IV's insistence that he be sentenced as soon as possible

28   demonstrates why defense counsel was not ineffective for moving to continue the sentencing.

1    Rather, the parties stipulated to advance the sentencing, just as they had stipulated to advance the

2    change of plea hearing, all in keeping with Mr. Ludwig IV's specific instructions to Mr. Cosca.

3    Indeed, as evidenced by Mr. Ludwig IV's letter, he was grateful defense counsel managed to have

4    the sentencing put back on July 8, 2015.  Furthermore, the prosecutor might have opposed such a

5    continuance.  The plea agreement expressly provided that the parties recommended a sentencing

6    guideline range of 77-96 months, which was based on the existing guidelines.[12]  (Ex. V.)  If Mr.

7    Cosca moved for a continuance to take advantage of the lower guideline range in Amendment

8    791, the prosecutor could object that the motion violated the recommended guideline range to

9    which she and Mr. Cosca stipulated.  In fact, Mr. Balazs testified that whether or not Judge

10   Mueller would have granted the continuance could have depended on whether the prosecution

11   opposed the continuance.  (ECF No. 378 at 209.)

12          By the time of sentencing, Amendment 791 had been adopted by the USSC, and its

13   effective date of November 1, 2015 was announced.  Balazs opined that where the plea agreement

14   agreed to a sentencing guideline range based on existing guidelines, he didn't

15                  think that necessarily is any kind of an agreement that under 3553(a)
                    you can't ask for some lower guideline range," . . .  Judge Mueller is
16                  generally fairly, I think, responsive to defense requests for
                    continuances.  And if you pointed out that the amendment is going
17                  into effect in a few months and you would like to take effect of it,
                    she would likely grant the request for continuance or say why don't
18                  we set it . . . beforehand and we'll discuss whether or not to give
                    effect to that amendment even before November 1st.
19

20   (ECF No. 378 at 211.)  But Balazs also testified that whether or not a judge would grant such a

21   continuance would be influenced by timing.  "If it was like a year away or ten months, it might be

22   different than if it was one month or two months."  (ECF No. 378 at 209.)

23          Here, the time gap was not a year or ten months, but it was also not a matter of days as in

24   Abney, nor was it one or two months.  See United States v. Abney, 812 F.3d 1079 (D.C. Cir.

25   _____

26   [12] While Mr. Ludwig IV faults the plea agreement for its silence on the date of the guidelines to
     be used, it is clear that the guidelines in effect at the time of sentencing were the guidelines used.
27   It was the current guidelines under which the PSR recommendations were calculated, and the plea
     agreement expressly states that the parties stipulated to the sentencing guideline range of 77-96
28   months of incarceration, which was the existing range at that time.  (Ex. CC-009.)

1    2016).  Mr. Ludwig IV signed the plea agreement on April 22, 2015, and his change of plea

2    hearing was held the same day.  If the sentencing judge took the plea date into consideration, it

3    would be just over six months before Amendment 791 became effective.  If defense counsel had

4    moved for the continuance on May 29, 2015, when the sentencing was continued for probation to

5    complete the PSR, the time gap would have been just over five months.  If calculated from the

6    date the prosecutor filed its sentencing memo on July 6, 2015, it would have been almost four

7    months (three months and 26 days) before Amendment 791 became effective.  Such various time

8    gaps fall into a gray area precluding this court from finding that a request for continuance of the

9    sentencing hearing would, to a reasonable degree of legal certainty, be granted.  Therefore, the

10   prejudice prong of Strickland is not met.  See, e.g., Bisel v. United States, 2015 WL 6393829

11   (S.D. Cal. Oct. 22, 2015) (failure to argue application of Amendment 782 was not deficient

12   because Amendment 782 did not become effective until almost seven months later, and because

13   defendant was a career offender, he was not entitled to relief under Amendment 782 in any

14   event).

15           Additionally, courts consider sentencing guidelines in place at the time of sentencing.  See

16   USSG § 1B1.11(a).  Thus, respondent's contention that requesting such an extension would be

17   improper or likely denied is not so far afield.  See United States v. Tanner, 544 F.3d 793, 798 (7th

18   Cir. 2008) (holding it proper for courts to "grant continuances to await clarification of the law,"

19   but improper to grant (or deny) a continuance for the very purpose of changing the substantive

20   law applicable to the case").

21           But even assuming that the prosecution would not object to the continuance, and Judge

22   Mueller would have granted the continuance, the undersigned does not find credible Mr. Ludwig

23   IV's new position that he would have agreed to such a continuance because at that time, his focus

24   and persistence was to be sentenced quickly so he could begin serving his federal sentence and

25   return to Oklahoma.  Mr. Ludwig IV argues that given the potential sentencing range reduction of

26   15 months such a decision was irrational and unbelievable, but on this record, such decision is not

27   so obvious because the result was much more speculative than Mr. Ludwig IV maintains.

28   ////

For all of those reasons, the undersigned cannot find that Mr. Cosca's failure to seek a continuance of the sentencing hearing was unreasonable.

B.  Was Defense Counsel Ineffective at Sentencing?

Mr. Ludwig IV contends that because the plea agreement allowed Mr. Cosca to argue that Amendment 791 adjusted "the tax tables for inflation through 2014 so that they would no longer overstate the seriousness and harm of the offense, and therefore a defendant's culpability, based on the monetary values involved," Mr. Cosca violated his duty of care by failing to argue the judge should consider applying the sentencing range proposed in Amendment 791 or sentence Mr. Ludwig IV to the low end of the existing guidelines range.  (ECF No. 385 at 49.)  Respondent counters that Mr. Cosca properly believed the negotiated plea agreement precluded such argument.  As discussed below, the undersigned is not persuaded that Mr. Cosca was ineffective for failing to so argue.

1.  Legal Standards

In evaluating defense counsel's performance, the undersigned must attempt to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, at 689. There is a strong presumption that counsel's performance was reasonable and within the appropriate professional standard.  Id.  To establish the prejudice prong of Strickland, movant must demonstrate that there is a reasonable probability that but for defense counsel's errors, the outcome of the plea-bargaining process would have been different.  Lafler, 566 U.S. at 164.

2.  The Underlying Basis for Amendment 791

The USSC explained the basis underlying the 2015 amendments:

> Due to inflationary changes, there has been a gradual decrease in the value of the dollar over time. As a result, monetary losses in current offenses reflect, to some degree, a lower degree of harm and culpability than did equivalent amounts when the monetary tables were established or last substantively amended. Similarly, the fine levels recommended by the guidelines are lower in value than when they were last adjusted, and therefore, do not have the same sentencing impact as a similar fine in the past. Based on its analysis and widespread support for inflationary adjustments expressed in public comment, the Commission concluded that aligning the above monetary tables with modern dollar values is an appropriate step at

49

1   this time.

2   The amendment adjusts each table based on inflationary changes
    since the year each monetary table was last substantially amended:

3

4   • Loss table in §2B1.1 and tax table in §2T4.1:  adjusting for inflation
    from 2001 ($1.00 in 2001 = $1.34 in 2014); . . . .

5   USSC, 2015 Amendments to the U.S. Sentencing Guidelines, p.12.  The relevant portion of the

6   tax table set forth at §2T4.1, amended under Amendment 791 reads as follows:

7   §2T4.1. Tax Table

8   [Multiplier Comparison Tax Loss (Apply the Greatest) Offense Level to Current Table]

9   [1.25] (G) More than $200,000   $250,000      18
    [1.38] (H) More than $400,000   $550,000      20

10

11  USSC, 2015 Amendments to the U.S. Sentencing Guidelines, p.30.

12          3.  Mr. Balazs' Testimony

13          Mr. Balazs testified that where the plea bargain provides a sentencing range of 77 to 96

14  months and expressly permits defense counsel to argue for the low term of 77 months, such

15  argument would have been the standard of care for defense attorneys practicing in the Eastern

16  District, Mr. Balazs "could see very little reason for the defense attorney not to bring that to the

17  judge's attention," and the failure of defense counsel to make such argument would violate the

18  standard of care.  (ECF No. 378 at 212, 214, 217.)  Further, Mr. Balazs opined that had defense

19  counsel brought Amendment 791 to Judge Mueller's attention, "it's very likely she would have

20  [sentenced] down to at least 77 months."  (ECF No. 378 at 217.)  "Judge Mueller is a judge I

21  would expect to give effect to a sentencing guideline amendment."  (ECF No. 217-18.)

22          The Court posed the following hypothetical:

23          If there is language that says that the defendant also agrees that the
            application of the United States Sentencing Guidelines to his case
24          results in a reasonable sentence, and that the defendant will not
            request that the court apply the sentencing factors under 18 U.S.C. §
25          3553 to arrive at a different sentence than that called for under the
            sentencing guidelines advisory guideline range as determined by the
26          court, the defendant acknowledges that if the defendant requests or
            suggests in any manner a different sentence than what is called for
27          under the advisory guideline range as determined by the court, the
            plea agreement is voidable at the option of the government.

28

50

1    (ECF No. 378 at 218.)  Given such hypothetical, the Court asked if defense counsel argued to the

2    sentencing judge that "if you did the new calculations, it would be lower, so just use those new

3    calculations to give the low end, isn't there a risk that the government is going to say:  Deal is

4    off?  We specifically said you can't do that?" (ECF No. 219.)  Mr. Balazs disagreed, stating he

5    "would interpret that provision as allowing the defense to ask for a low-end guideline sentence for

6    any reason that would be appropriate under the sentencing factors generally." (ECF No. 378 at

7    219.)  Of course, if defense counsel attempted to argue below the low end, then Mr. Balazs

8    opined that counsel could be subject to violating the terms of the plea agreement and the

9    government could ask to void the agreement.  "But to ask for the low-end sentence . . . is fair

10   under that provision." (ECF No. 378 at 219.)  Mr. Balazs opined that such argument would fall

11   under 3553(a) "in terms of the severity and nature of the offense, now you have the Commission

12   determining that because they weren't involved in inflation, the effect of the amount of the loss

13   may overstate the seriousness of the offense." (ECF No. 378 at 221.)  Mr. Ludwig IV

14   subsequently identified 18 U.S.C. § 3553(a)(2)(A) allowed the court to consider the need for the

15   sentence to reflect "the seriousness of the offense" and "to provide just punishment for the

16   offense.   ECF No. 391 at 26, citing ECF No. 378 at 207.)

17                                      4.  The Plea Agreement

18          While the written plea agreement makes no mention of impending Amendment 791, it

19   expressly states that "[i]f the defendant, cooperating or not, violates this plea agreement in any

20   way, . . . this plea agreement is voidable at the option of the government." (ECF No. 130 at 3:19-

21   20.)  The agreement precluded Mr. Cosca from moving or arguing in support of any departure

22   from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines

23   under Booker, 543 U.S. at 220.  (ECF No. 130 at 8.)  The agreement also precluded Mr. Cosca

24   from requesting that the Court apply the 18 U.S.C. § 3553 sentencing factors "to arrive at a

25   different sentence than that called for under the Sentencing Guidelines' advisory guideline range

26   as determined by the court." (ECF No. 130 at 9.)

27          While the plea agreement allowed Mr. Cosca to argue the low end of the applicable

28   guideline range "as determined by the Court," the agreement also included the parties' stipulated

                                                    51

1   sentencing range of 77-96 months, which was the mid-level sentencing range under the existing

2   guidelines.  (ECF No. 130 at 5:13-14, 8:20-21.)  The plea agreement confirmed the Court's sole

3   discretion in sentencing; the Court did not have to accept the government's recommendation, but

4   could impose any sentence up to and including the statutory maximum stated in the plea

5   agreement.  (ECF No. 130 at 1-2.)

6           5.  Discussion

7           Despite Mr. Balazs' testimony, the undersigned is not persuaded that under the unique

8   circumstances of this case the written plea agreement allowed movant to argue for application of

9   the lower guideline range proposed in Amendment 791 or to consider the amendment's

10  underlying basis to sentence Mr. Ludwig IV to the low end of the existing guidelines.[13]  Mr.

11  Cosca testified that he knew about and researched the impending guidelines changes, which is

12  how he was able to discuss them with Mr. Ludwig IV.  (ECF No. 378 at 27-28, 32-33, 52-53.)

13  But whether or not Mr. Cosca and the prosecution had agreed Amendment 791 could not be

14  applied, the written plea agreement demonstrates that Mr. Cosca and the prosecutor agreed to a

15  sentencing range based on the existing guidelines.  Thus, arguing for application of Amendment

16  791 to obtain a lower sentencing guideline range, or to use the amendment's underlying basis to

17  apply the low end of the existing guidelines, could be viewed as Mr. Cosca's attempt to

18  circumvent the agreed-upon sentencing range under the existing guidelines.

19          In addition, whether or not movant's co-defendants received benefit of Amendment 791 is

20  not persuasive because under Strickland, this court evaluates Mr. Cosca's performance, and

21  movant's co-defendants were not equally culpable to Mr. Ludwig IV, who was the leader who

22  came up with the fraud scheme.

23          Whether or not the district judge would have considered or applied the lower sentencing

24  range before it became effective is mere speculation.  Perhaps if this was Mr. Ludwig IV's first

25  offense or he had not been the leader of the fraud scheme at issue here, the court could say with

26  _____

27  [13]  Other than his general reference to drug minus two cases, which can be applied retroactively,
    Mr. Balazs did not cite a specific case where the court was persuaded to apply pending guidelines
    prior to their effective date, and movant's counsel provided no legal authorities suggesting
28  defense counsel is required to make such arguments at sentencing.

1    some certainty that the court would have applied the lower range before Amendment 791 became

2    effective.  But Mr. Ludwig IV's criminal history (six-time felon), the fact he created and led this

3    fraud scheme while in state prison, luring his own father in to assist, Mr. Ludwig IV's own

4    remark that financial crimes have always been "fun," and the sentencing judge's comments that

5    she believed the 84 month sentence was appropriate, make it less clear that the judge would be

6    inclined to employ the lower sentencing range prior to November 1, 2015.

7         Importantly, the undersigned finds credible Mr. Cosca's stated reasons for not making

8    such arguments.  When asked why Mr. Cosca did not have a duty of care to argue for 77 months

9    based on the pending changes to the tax table, Mr. Cosca explained on direct exam:

10              Because the agreement with the government was no sophisticated
                means, stick with the current guidelines, and that was the deal.   So
11              if I started to argue contrary to that position at sentencing, then I
                feared that could open the door to the government bringing out all of
12              these aggravating facts and causing Judge Mueller to even go higher
                than mid-range.   . . . .  I didn't want to bring up the change in the
13              guideline after agreeing to go with the current guidelines and then
                trigger the government's response which may be damaging.
14

15   (ECF No. 378 at 130-31.)  Mr. Cosca advised Mr. Ludwig IV such enhancement was a real

16   danger; Mr. Cosca was aware of this risk, in part, because he discussed it with the prosecutor, and

17   negotiated for it not to appear in the plea agreement.  (ECF No. 378 at 107.)  Thus, Mr. Cosca did

18   not want to give the prosecutor a basis to revive any enhancements or to void the agreement.  The

19   written plea agreement supports such testimony:  "[i]f the defendant . . . violates this plea

20   agreement in any way, . . . this plea agreement is voidable at the option of the government."

21   (ECF No. 130 at 3:19-20 (emphasis added).)  While Mr. Ludwig IV strenuously argues that the

22   sophisticated means enhancement was a red herring, he provides no legal authority demonstrating

23   that such enhancement could not be applied, even after Amendment 792 became effective,

24   whether or not it was movant's risk to assume.

25         As argued by respondent, had Mr. Cosca made either argument, the prosecutor could

26   argue to impose other enhancements, and Mr. Balazs conceded that the prosecutor "could

27   potentially try to argue for some other enhancements."  (ECF No. 378 at 226.)  The written plea

28   agreement did not preclude such arguments, and the prosecutor could argue that movant's

1   leadership role, the sophisticated fraud scheme, and movant's lengthy criminal history justified

2   not giving movant the benefit of such pending amendment.  Effective counsel would not

3   knowingly risk having the defendant lose the benefits of a favorable plea bargain.

4          There is a strong presumption that Mr. Cosca's representation was reasonable, and this

5   court finds Mr. Cosca's explanation for why he did not make such putative arguments to be

6   objectively reasonable.  Mr. Cosca certainly negotiated a better sentence than Mr. Ludwig IV

7   would have received had he gone to trial, as even movant concedes.  The undersigned cannot find

8   that Mr. Cosca's failure to argue at sentencing for the application of Amendment 791 or its

9   underlying basis was deficient under these circumstances.

10          In addition, Mr. Ludwig IV was not entitled to the benefits of Amendment 791 because he

11   was being sentenced prior to its effective date.[14]

12          But even assuming, arguendo, Mr. Cosca should have made such arguments, the

13   undersigned cannot find prejudice.  Because it is unclear how the prosecution would respond to

14   such arguments, it is mere speculation to guess what the sentencing judge would have done.

15   Moreover, even if the prosecution did not object to such new arguments, it is not reasonably clear

16   the sentencing judge would have applied Amendment 791 before it became effective, or would

17   have sentenced movant to the low end of the existing guidelines.  Judge Mueller's comments at

18   sentencing demonstrate she found Mr. Ludwig IV was the leader involved in a sophisticated fraud

19   scheme:

20                 The offense itself, I mean, pretty -- not unsophisticated tax fraud
                    scheme, run from a prison while Mr. Ludwig is serving a sentence
21                 on another fraud.  He's got a lengthy history, including multiple -- as
                    the PSR points out, I think it's not disputed, this was his sixth
22                 conviction involving financial fraud, seventh felony. And he was the
                    leader.
23

24   _____

25   [14]  The USSC has not listed Amendment 791 in U.S.S.G. § 1B1.10(d) as an amendment that
     applies retroactively.  See U.S.S.G. § 1B1.10(d).  Rather, the USSC expressly characterized the
26   change as a "substantive amendment."  U.S.S.G., App. C. Supp. at 10.  Finally, Amendment 791
     did not involve or resolve a circuit split.  Thus, Mr. Ludwig IV could not move to have the
27   amendment applied to his July 8, 2015 sentence after November 1, 2015, because Amendment
     791 does not apply retroactively.  See United States v. Quintero-Leyva, 823 F.3d 519, 522 (9th
28   Cir. 2016 (identifying three factors used to assess whether an amendment applies retroactively).

(ECF No. 148 at 3.)  Given the serious nature of Mr. Ludwig IV's offenses, as well as his lengthy criminal history, even if the prosecution did not object to the proposed new argument in favor of considering Amendment 791, it is too speculative to find it reasonably probable that the sentencing judge would have applied the proposed sentencing range or sentenced movant to the low end of the existing guidelines range.

Because of all the uncertainties discussed above, any alleged prejudice is mere speculation.  Therefore, the undersigned cannot find prejudice under Strickland.

In summary, the undersigned recognizes that Mr. Cosca could have done a better job of taking contemporaneous notes and documenting his file.  In other respects, the undersigned found the testimony of Mr. Cosca and Ms. Hilder credible.  Conversely, the undersigned found movant's testimony to be not credible, and instead a case of buyer's remorse and a weak attempt to rewrite history.  Similarly, while the undersigned respects Mr. Balazs and recognizes his legal experience, the court found his opinions to be largely unsupported speculation and wishful thinking.  Accordingly, for all of these reasons and those set forth above, the motion should be denied.

VI.     CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Mr. Ludwig IV's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 206) be denied; and

2. The Clerk of the Court be directed to close the companion civil case No. 2:16-cv-1513 KJM.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If movant files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

1    applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

2    § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

3    service of the objections.  The parties are advised that failure to file objections within the

4    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

5    F.2d 1153 (9th Cir. 1991).

6    Dated:  June 25, 2020

7

8                                                KENDALL J. NEWMAN
                                                 UNITED STATES MAGISTRATE JUDGE
9

10   /ludw0043.257.2255

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28